JUDGE PAULEY

PILLSBURY WINTHROP SHAW PITTMAN LLP
Kenneth W. Taber
Andrew C. Smith
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
kenneth.taber@pillsburylaw.com
andrew.smith@pillsburylaw.com

*Attorneys for Defendants Nader Ghermezian, Donald Ghermezian,
Raphael Ghermezian and Triple Five Worldwide*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 4117

RECEIVED JUN 14 2013 U.S.D.C. S.D.N.Y. CASHIERS

| | |
|---|---|
| MARK J. PODLIN,<br><br>Plaintiff,<br><br>-against-<br><br>NADER GHERMEZIAN, DONALD GHERMEZIAN, RAPHAEL GHERMEZIAN, TRIPLE FIVE WORLDWIDE, TRIPLE FIVE, L.L.C., TRIPLE FIVE GROUP, TRIPLE FIVE PROPERTIES, LLC, TRIPLE FIVE NY, LLC, TRIPLE FIVE INTERNATIONAL INC., TRIPLE FIVE HOLDINGS, L.L.C., THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, NEW JERSEY GOVERNOR CHRIS CHRISTIE, COLONY CAPITAL, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Docket No.<br><br>Redacted<br><br>**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(B) (DIVERSITY OF CITIZENSHIP JURISDICTION)** |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that defendants Nader Ghermezian, Donald Ghermezian,

Raphael Ghermezian, and Triple Five Worldwide (collectively, "Moving Defendants"), by and

through their undersigned counsel, pursuant to 28 U.S.C. § 1441, respectfully submit this Notice

of Removal of this action from the Supreme Court of the State of New York, County of the Bronx (Civil Index No. 21748/2013E), in which this action is pending, to the United States District Court for the Southern District of New York, being the district embracing the place where the action is pending.  In support of this Notice of Removal, Moving Defendants state as follows:

## BACKGROUND

1.  On May 14, 2013, an action was commenced in the Supreme Court of the State of New York for the County of the Bronx entitled *Mark J. Podlin v. Nader Ghermezian, et al.*, with Index No. 21748/2013E.  A true and accurate copy of all filings in the above-referenced action are attached hereto.

2.  Plaintiff, Mark J. Podlin ("Plaintiff"), brought this action against defendants Nader Ghermezian, Donald Ghermezian, Raphael Ghermezian, Triple Five Worldwide, Triple Five, L.L.C., Triple Five Group, Triple Five Properties, LLC, Triple Five NY, LLC, Triple Five International Inc., Triple Five Holdings, L.L.C., The New Jersey Sports and Exposition Authority, New Jersey Governor Chris Christie, and Colony Capital, LLC (collectively, "Defendants"), alleging breach of contract, fraud, slander, equitable relief in quantam meruit, promissory estoppel, and racketeering fraud.

3.  Plaintiff seeks treble damages of $600,000.00.

## BASIS FOR REMOVAL: DIVERSITY JURISDICTION

4.  This Court has original jurisdiction over this civil action because there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs, under 28 U.S.C. § 1332(a).

## Timeliness

5.   This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b), in light of the fact that Plaintiff has yet to properly serve Defendants with the complaint.

6.   On May 17, 2013, Plaintiff sent the complaint via electronic mail to the Moving Defendants.  Electronic mail is not a proper method of service.  *See* N.Y. C.P.L.R. §§ 308, 311.

7.   Nevertheless, even if the complaint had been properly served on May 17, 2013, this Notice of Removal is timely because it was filed on June 14, 2013, which is within 30 days of that date.

## Complete Diversity of Citizenship

8.   There is complete diversity of citizenship between Plaintiff and the Defendants in this action because:

(a)  Upon information and belief, Plaintiff Mark J. Podlin is a citizen of the State of Georgia, as set forth in the complaint.

(b)  None of the properly joined Defendants in this action is a citizen of the State of Georgia:

(i)     Moving Defendants Nader Ghermezian, Donald Ghermezian, and Raphael Ghermezian are Canadian citizens with primary places of residence in Edmonton, Canada.

(ii)    Moving Defendant Triple Five Worldwide has its global headquarters in Canada, and has its U.S. headquarters in Las Vegas, Nevada.

(iii)   Upon information and belief, Defendant The New Jersey Sports and Exposition Authority has its headquarters and primary place of

3

business in the State of New Jersey.

(iv)    Upon information and belief, Defendant Governor Chris Christie is

a citizen of the State of New Jersey.

(v)    Upon information and belief, Defendant Colony Capital, LLC, is a

citizen of the State of California.

(c) The remaining Defendants are not properly joined to this action because they

are corporate entities that have no real connection to the controversy. *See Pampillonia v.*

*RJR Nabisco, Inc.*, 138 F.3d 459, 460-461 (2d Cir. 1998) ("[A] plaintiff may not defeat a

federal court's diversity jurisdiction and a defendant's right of removal by merely joining

as defendants parties with no real connection with the controversy."). Specifically, the

complaint contains no allegations relating to Defendants Triple Five, L.L.C., Triple Five

Group, Triple Five Properties, LLC, Triple Five NY, LLC, Triple Five International Inc.,

and Triple Five Holdings, L.L.C. As a result, the citizenship of these entities need not be,

and should not be, considered when determining whether diversity jurisdiction exists.

*See Navarro Savings Assn. v. Lee*, 446 U.S. 458, 460–61 (holding that "citizens"

considered for diversity purposes "must be real and substantial parties to the

controversy," and "a federal court must disregard nominal or formal parties and rest

jurisdiction only upon the citizenship of real parties to the controversy").

### Amount in Controversy

9. As described in paragraph 3 above, Plaintiff seeks treble damages of $600,000.00.

10. Thus, the amount in controversy in this action exceeds $75,000 exclusive of interest,

costs, and attorney's fees. *See* 28 U.S.C. § 1332.

## CONCLUSION

11.  The Moving Defendants consent to the removal of this action to this Court.  The Moving Defendants are not aware of the identity of counsel for Defendants the New Jersey Sports and Exposition Authority, Governor Chris Christie, and Colony Capital, LLC, as these Defendants have not appeared in this action.

12.  This removal is timely, and all conditions and procedures for removal have been satisfied, including those required by 28 U.S.C. § 1446 and the Local Rules of the United States District Court for the Southern District of New York. *See* 28 U.S.C. § 1446(a)-(b); L. Rule 81.1.

13.  Based upon the above stated facts and legal principles, and in accordance with 28 U.S.C. § 1441(a)-(b), this entire action is properly removable to the United States District Court for the Southern District of New York.

WHEREFORE, the Moving Defendants respectfully request that this case be removed from the Supreme Court of the State of New York, County of the Bronx, to this Court, and that this Court assume jurisdiction of this action and issue such further orders and processes as may be necessary to bring before it all parties necessary for the trial.

Dated: New York, New York
         June 14, 2013

                                PILLSBURY WINTHROP SHAW PITTMAN LLP

                                Kenneth W. Taber
                                Andrew C. Smith
                                1540 Broadway
                                New York, New York 10036
                                Telephone:  (212) 858-1000
                                Facsimile:  (212) 858-1500
                                kenneth.taber@pillsburylaw.com
                                andrew.smith@pillsburylaw.com

                                *Attorneys for Nader Ghermezian, Donald Ghermezian,*
                                *Raphael Ghermezian, and Triple Five Worldwide*

[FILED: BRONX COUNTY CLERK 05/14/2013]

NYSCEF DOC. NO. 1

INDEX NO. 21748/2013E

RECEIVED NYSCEF: 05/15/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

MARK J. PODLIN, Plaintiff/Petitioner                    INDEX NO.

    --against—

NADER GHERMEZIAN

DONALD GHERMEZIAN                                       **SUMMONS**

RAPHAEL GHERMEZIAN

TRIPLE FIVE WORLDWIDE                                   Date Index No. Purchased:
AND ALL RELATED TRIPLE FIVE
BUSINESS ENTITIES INVOLVED
IN THE AMERICAN DREAM
AT THE NEW JERSEY MEADOWLANDS

INCLUDING THESE NEW YORK ENTITIES:

TRIPLE FIVE, L.L.C.

TRIPLE FIVE GROUP

TRIPLE FIVE PROPERTIES, LLC

TRIPLE FIVE NY, LLC

TRIPLE FIVE INTERNATIONAL INC.

TRIPLE FIVE HOLDINGS, L.L.C., AND,

THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY

NEW JERSEY GOVERNOR CHIS CHRISTIE, AND

COLONY CAPITAL, LLC,
                                    Defendants.

    To the above named Defendants:

NADER GHERMEZIAN, DONALD GHERMEZIAN, RAPHAEL GHERMEZIAN,
TRIPLE FIVE WORLDWIDE AND ALL RELATED TRIPLE FIVE BUSINESS
ENTITIES INVOLVED IN THE AMERICAN DREAM

AT THE NEW JERSEY MEADOWLANDS, INCLUDING THESE NEW YORK ENTITIES:   TRIPLE FIVE, L.L.C., TRIPLE FIVE GROUP, TRIPLE FIVE PROPERTIES, LLC, TRIPLE FIVE NY, LLC, TRIPLE FIVE INTERNATIONAL INC., TRIPLE FIVE HOLDINGS, L.L.C., AND, THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, NEW JERSEY GOVERNOR CHIS CHRISTIE, AND COLONY CAPITAL, LLC

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is the business office location where the contract was made, which is the location of Triple Five business offices at 3333 Henry Hudson Parkway, Riverdale, New York.

Dated: May 14, 2013

MARK J PODLIN ATTORNEY AT LAW PC
By: s/ Mark J. Podlin
Mark J. Podlin
407 Butler Avenue, Suite 2000
P.O. Box 20989
St. Simons Island, GA 31522
(912) 571-1873
markpodlin@yahoo.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

MARK J. PODLIN, Plaintiff/Petitioner

   --against—

NADER GHERMEZIAN                         INDEX NO. _____

DONALD GHERMEZIAN

RAPHAEL GHERMEZIAN

TRIPLE FIVE WORLDWIDE               **COMPLAINT**
AND ALL RELATED TRIPLE FIVE
BUSINESS ENTITIES INVOLVED
IN THE AMERICAN DREAM
AT THE NEW JERSEY MEADOWLANDS

INCLUDING THESE NEW YORK ENTITIES:

TRIPLE FIVE, L.L.C.

TRIPLE FIVE GROUP

TRIPLE FIVE PROPERTIES, LLC

TRIPLE FIVE NY, LLC

TRIPLE FIVE INTERNATIONAL INC.

TRIPLE FIVE HOLDINGS, L.L.C., AND,

THE NEW JERSEY SPORTS AND EXPOSITION AUTHORITY

NEW JERSEY GOVERNOR CHIS CHRISTIE

COLONY CAPITAL, LLC               __COMPLAINT__


TO THE SUPREME COURT OF THE STATE OF NEW YORK:

    The Complaint of the Plaintiff, Mark Podlin, respectfully shows and alleges as follows:

## SUMMARY OF THE CAUSE OF ACTION AND DAMAGES

1.  This is an action for Breach of Contract; Fraud; Slander; equitable relief in Quantum Meruit, Promissory Estoppel, and Racketeering Fraud under the RICO Act against the Defendants Triple Five Worldwide, Nader Ghermezian, Raphael Ghermezian, Donald Ghermezian, as well as the other named Defendants listed above, and currently unidentified related entities with assets who are involved in developing the American Dream at the New Jersey Meadowlands. These Defendants both maintain a principal place of business for their Triple Five businesses and reside at 3333 Henry Hudson Parkway in Riverdale, New York. The Defendants are engaged in the business of operating shopping malls.

2.  The total value of Plaintiff's basic claim against the Defendants is more than Two Hundred Million ($200,000,000.00) United States Dollars since the Defendants agreed to pay the Plaintiffs ten percent (10%) of the value of the Xanadu Meadowlands project **[EXHIBIT 8 is evidence that the Xanadu value is more than Two Billion Dollars]** (in addition to other amounts described below in this Complaint) if the Plaintiff was able to help them gain control of it by contacting the New Jersey Sports and Exposition Authority, the office of the Governor of New Jersey, and anyone else who could help them get control of Xanadu Meadowlands to enable them to redevelop it. The Defendants have publicly announced the total value of the Meadowlands American Dream as being worth more than Two Billion Dollars. When the Plaintiff's claims against the Defendants are trebled because of the Defendants' violation of the RICO Act, then Plaintiff's total claim against the Defendants, who should be jointly and

severally liable, is for a total amount of more than SIX HUNDRED MILLION ($600,000,000.00) DOLLARS

3. The Plaintiff also joins Colony Capital, LLC (holder of the Ground Lease on Xanadu from the New Jersey Sports and Exposition Authority), the New Jersey Sports and Exposition Authority, and the Governor of New Jersey as parties Defendant because they are necessary parties to the action since the Plaintiff, both an attorney and a real estate broker licensed in New York, was the procuring cause in introducing the parties, establishing the relationship between them that resulted in the sale of the property, and setting up the deal with the New Jersey Sports and Exposition Authority, Colony Capital, LLC, and the State of New Jersey that enabled Triple Five to purchase the former Xanadu at The Meadowlands to redevelop it as The American Dream.

4. If the other Defendants fail to pay the amounts due the Plaintiff for his claims against Triple Five Worldwide and the related Triple Five corporations and family members, then the Plaintiff is entitled to receive payment directly from the New Jersey Sports and Exposition Authority, Colony Capital, LLC, and the State of New Jersey for being the procuring cause of the American Dream deal.

## PLAINTIFF'S STATEMENT OF HIS CASE AGAINST THE DEFENDANTS

1. My name is Mark J. Podlin, and I am both an attorney and real estate broker licensed to practice in New York. I am the procuring cause who enabled Triple Five, the owner of The Meadowlands, to make the deal with the New Jersey Sports and Exposition Authority and State of New Jersey to purchase it so the Defendants could redevelop it as The American Dream.

2. On Tuesday afternoon, February 23, 2010, I received a phone call from Nader Ghermezian while I was in Chicago. He called me from his Riverdale Office in New York and wanted to know if I thought I could help him get control of Xanadu at the Meadowlands because of my years of experience in the mall redevelopment business, along with my relationships with governmental officials in the State of New Jersey. Nader also asked me if I would be interested in being the Chief Executive Officer of Triple Five's International Shopping Center Development Division.

3. Nader knew I had previously worked as the Senior Development Officer of DeBartolo Development, LLC; Executive Vice President of JMB/Urban Retail Properties, Inc.; and Senior Vice President of Jones Lang LaSalle; as well as other significant positions in the retail industry, such as Regional Real Estate Attorney for JCPenney Company, Inc., and the Senior Real Estate Negotiator for Target Corporation. Nader liked the idea that I was also an attorney.

4. Nader asked me if I could come to New York immediately to meet with him at his Triple Five New York Headquarters Office located at 3333 Henry Hudson Parkway in Riverdale, New York. I agreed that I would immediately make a reservation after talking with him on the phone and fly into New York to meet with him at his office the next day, Wednesday, February 24, 2010.

5. On Wednesday, February 24, I met with Nader Ghermezian and some of his other family members in his Triple Five New York Headquarters at 3333 Henry Hudson Parkway in Riverdale, New York, from 1pm until 4pm—a three hour meeting. Before we started talking much further, Nader asked me to sign a non-disclosure agreement that would prevent me from saying anything about the proposed Xanadu Meadowlands deal except in Court. [**Please see**

**EXHIBIT 1, which constitutes a signed writing between the parties related to the subject of the agreement—Triple Five and the Ghermezian Family's obtaining my assistance to enable them to quickly gain control of the Xanadu deal with the State of New Jersey and the New Jersey Sports and Exposition Authority before another developer, like The Related Companies, could do so].** During this three hour meeting, Nader primarily focused on asking me questions about how I might be able to help Triple Five get control of Xanadu at the Meadowlands.

6. I told Nader that years ago when the Meadowlands was first proposed, I had been asked by a headhunter about becoming involved in developing the project for the original developer, but I had not pursued it. However, I told him I was very interested in redeveloping the mall myself, now that the original development concept had not been successful.

7. Nader said that he doubted that I could successfully enable Triple Five to get control of Xanadu at The Meadowlands because he had heard that The Related Group was a shoe-in for the deal because of the development they had successfully completed at Columbus Circle. He said he had heard they had already been signed to the deal. **[EXHIBIT 3, █████REDACTED█████**

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████**]**

8. I told Nader that I didn't think The Related Group already had a signed deal for Xanadu, and that I thought I might be able to succeed in getting control of Xanadu, if Triple Five would hire me as CEO of the International Mall Development group, as he had suggested.

9.  Nader asked me how much compensation I would require and what the structure of the deal would be.  After talking with Nader that afternoon, at the end of our meeting, I proposed that he would pay me $12,000 per month in cash starting immediately + 10% of all fees generated from Xanadu and every other deal I worked on + 5% of the value of the project at the time we take it over along with 5% of the increased value of the project over time + a discretionary success bonus.

10.  We negotiated for more than an hour about what the terms of employment and compensation would be if I agreed to work for him as CEO of the International Mall Development Group of Triple Five.  Finally, Nader and I agreed that he would immediately start paying me $12,000 per month + 10% (ten percent) of the appraised property value of all the deals I brought in, especially with respect to Xanadu at The Meadowlands.  However, Nader said he needed me to also meet his brother Raphael Ghermezian, who also lived in New York, but that Raphael would not be in the office until the following day, Thursday, February 25, 2010.

11.  On Thursday, February 25, 2010, I returned to the Triple Five New York Headquarters located at 3333 Henry Hudson Parkway in Riverdale, New York, to meet again with Nader Ghermezian.  At the beginning of my meeting with him at a large conference table by the window, he also introduced me to his brother Raphael Ghermezian, Roy, Justin, and Dahlia.

12.  Accompanying me to this meeting was Randi LaFerney, the Vice President of Leasing for Podlin International Realty, Ltd., which is my own mall development consulting company.

13.  We all met together, with various of the other family members coming and going in and out of the meeting while Nader, Randi, and I talked together about what approach I would

take to make the deal to take over Xanadu and whether or not I thought I could really succeed.  I told him that I thought I could succeed and that I had already made some inquiries to the some of my contacts in Palmyra, New Jersey, where I had previously been working on a major enclosed mall and land reclamation project for two years while I was the Senior Development Officer for DeBartolo Development, LLC.

14.  Nader was very anxious about hearing as much as possible about everything I knew about the Xanadu project and my contacts who might enable me to get control of Xanadu for Triple Five.

15.  I explained to Nader that there was no guarantee that anything could be accomplished to guarantee him control of Xanadu, but I thought that I might be the only person in the country who could get control of the project for him, because I had been involved in a lot of redevelopment projects before, some in New Jersey, like the redevelopment of Riverside Square in Hackensack with Bloomingdales and Saks Fifth Avenue; Moorestown Mall where I added Boscov's Department Store; Monmouth Mall; and most recently, the major mall development project in Palmyra for more than two years.

16.  I told Nader that I thought the concept of Triple Five, owner of Mall of America, might appeal to the New Jersey Sports and Exposition Authority, which had decision making authority as to who actually took over Xanadu to redevelop it.

17.  With Raphael and Randi in the room, we discussed compensation at greater length, and I said that I would have to have a minimum of $12,000 per month to work as CEO of the Triple Five International Mall Development Group plus 10% of the appraised real estate value of everything I brought in plus 10% of the increased value of the project over time.  Nader tried to

convince me to take less than that by saying he would also guarantee me a large portion of the fees we brought in, but because he couldn't explain what kind of fees he was talking about or how those could ever be estimated, I told him I would have to have $12,000 per month in cash each month plus 10% of the current real estate value and future real estate value of the deals I worked on to compensate me for bringing in the deal and working to redevelop the property and add additional value to it over time.

18.   During the latter part of this meeting with Nader and his brother Raphael on Thursday, February 25, 2010, I made a special point of saying to Nader that if I were to be successful in getting the Xanadu deal for Triple Five, then I also wanted his agreement that I could be the person to run the entire Xanadu redevelopment operation.  He said that I could do that and that, of course, the rest of the family would also be involved because they owned West Edmonton Mall and Mall of America and new how to operate big malls.  I told him I understood that but we had to have an agreement that if I were to help them get Xanadu, I would be the one to run the redevelopment, and Nader and Raphael both shook their heads and said *"OK OK, but you have to get it for us first"*.

19.   Nader called me on the phone the next afternoon on Friday, February 26, 2010, after I had moved from the Royalton Hotel to the Sheraton Hotel on 52nd Street, and tried to convince me to work for $12,000 per month but only 2% equity in the deals, and I told him that would not be acceptable and that I would only work for $12,000 cash per month if I had 10% of the real estate value of every deal I brought in, plus increases in that value after I redeveloped or developed the property further.  **[Please see EXHIBIT 9, an email dated April 30, 2011, from me to Nader, Raphael and Don Ghermezian, as evidence that I asked for this payment from the Defendants on April 30, 2011, after it was announced Triple Five had gained**

control of Xanadu. They responded and refused to pay me in a group of slanderous and insulting emails.]

20. In that phone call, Nader then said he wanted to hire me right away as CEO of the Triple Five World Wide Mall International Development Group to do the Xanadu deal and also to come to Canada and work in Canada with him in Triple Five's Headquarters Office in Alberta, Canada, located inside West Edmonton Mall.

21. Nader said he wanted me to start immediately by working with him in New York and attending a meeting with him on Sunday, February 28, with Kevin O'Neill, who Nader said was his head of International Construction for a project Nader wanted to do in Libya with the Ghaddafi regime.

22. On Sunday morning, February 28, 2010, Nader said on the phone that I should go to the Plaza Hotel on Central Park and meet with Kevin O'Neil at 12pm in the lobby of the hotel where Kevin would be waiting to meet me. Nader said that he would join us later and that we would then all meet with REDACTED , who was with the Libyan Government, and who had just flown in from Tripoli in Libya to meet with us about doing a major resort on the ocean outside Tripoli.

23. Nader said that REDAC was a relative of a general who worked for Ghaddafi and that if they said we had the deal, we would have it, but we had to negotiate the terms, and that's what Nader wanted me to begin discussing at the meeting. However, Nader said that I was not to tell Kevin that Nader had just hired me. Instead, Nader told me he wanted me to tell Kevin that I had been working with Nader for a couple of years in the Triple Five Headquarters in Alberta, Canada, helping Nader to put major development deals together. Nader said that otherwise it

would be difficult to get Kevin to accept working for me because Kevin thought he himself should be in charge of everything. He said Kevin has a big ego and we have to treat him gently and tell him only what we want him to know.

24. Immediately after our meeting with REDA , Nader pulled me aside and said he wanted me to fly back to his headquarters in Alberta, Canada, with him that Sunday night on his same flight. I told Nader that was such short notice it would be impossible, especially since I didn't even have my United States Passport with me on the trip to New York, because I had no idea I would be going out of the country. However, I said if we had our deal on the terms we had agreed--$12,000 per month + 10% of the value of the deals present and future--I could arrange to come to Alberta on Monday, the very next day, after I had flown back home to St. Simons Island to get my passport and repack for an extended trip to Canada. Nader said "Yes, yes. I will have my in-house attorney draw up the agreement in writing when I get back to Canada."

25. I flew back home through Jacksonville, Florida, on Sunday night, February 28, 2010, from LaGuardia Airport in New York. The next day, on Monday, March 1, 2010, I flew from Jacksonville, Florida, to Canada, and Triple Five paid for my stay at the Fantasyland Hotel, which is located within West Edmonton Mall, the largest mall in North America. **[Please see EXHIBIT 2 as proof of this trip to their offices to work.]** The offices of Triple Five are located a short walk across the mall from the Fantasyland Hotel to their separate office building, where Nader had arranged for me to have a permanent office.

26. When I arrived at Triple Five's Headquarters in the West Edmonton Mall in Alberta, Canada, on Tuesday morning, March 2, 2010, I was first processed through the security office in

the mall where they took my picture and created an ID card and security pass card in order to enter the offices. I noticed immediately that the ID I was given was not an employee ID, but was instead labeled as a Consultant ID. I knew this was wrong, and mentioned it, but the person in the security office said that I should just use the Consultant ID until they got around to changing it later.

27. So, I went across the mall to the elevators, which I rode upstairs to the outer doors of the entrance to the Triple Five World Headquarters. There I met Nader's Corporate Executive Assistant (and my assistant) Donna Hildebrandt, who showed me where my office would be located. They said they had to clean it out first because another person had been in there before me.

28. Later in the morning, Nader arrived and he said to me that Khaled had already called him at home that morning to talk about the Libyan development deal, and that we needed to set up a conference call right away with Khaled who was in Cairo. For lunch I met with Matt McLash, who was Nader's primary in-house attorney on Nader's business deals.

29. On Wednesday, March 10, 2010, Nader asked me to look into the possibility of purchasing a jet plane from the Libyans to lease to a group of Nigerians. I asked Nader if that would be legal, and told him I was concerned about getting involved in any activity (since I am an American Citizen) that would be illegal under the special laws of the United States dealing with these kinds of things. I asked the attorney Matt McLash about it, and he said he didn't know anything. I placed some calls to BAE Systems in London to talk with them about the correct protocol for finding, financing, and repossessing planes, as well as the legal ramifications

of being involved, and they said they could guide us, plus they had a system in place for recovering the planes from Nigeria if the buyers failed to pay.

30. Later that same day, I mentioned the conversation with BAE to Nader and asked him about the legality working with Nigeria on this, and he said he had contacts in Nigeria and they had been working there for a while through a guy he said he hired named Mark London who used to work for General Growth in Chicago before. Nader said they "got rid of him" because "he was trouble" and "he was a crook". Nader said they had "paid him off" money "he didn't deserve to get rid of him." I realized then that this was probably the same guy who had had my same office that they had to clean out to make room for me.

31. I had known Mark London years before when he as an officer of The Equity Group with Sam Zell in Chicago. I knew him to be a very capable real estate person and was concerned first of all that Nader had failed to pay Mark London, that Mark London actually went to Nigeria to work for Nader on a project, and that--after all that--Nader was calling Mark London a "crook" for no apparent reason other than that Mark London had legitimately expected to be paid for his work as he had been previously promised by Nader.

32. On Thursday, March 4, 2010, I worked from my office at West Edmonton Mall on another special project involving potential investment in carbon credits, as well as Uranium mining, in the Congo.

33. During these early days in the Triple Five West Edmonton Mall Headquarters, I was making phone calls to inquire about who might be able to help me figure out a way to get Xanadu for us at Triple Five. Several people I called said they might be able to help but wanted to know how much I would agree to pay them in advance for their help. I did not pursue those

discussions with those people, but I instead relied upon my contacts with various people I had met while working on the very large development project we were proposing to do in Palmyra, New Jersey.

34. In advance of calling my contacts in Palmyra, I asked Nader if Triple Five could be interested in pursuing the major land reclamation and mall development deal that I had been working on originally with DeBartolo in Palmyra, New Jersey, since DeBartolo had decided to get out of the mall development business during the 2008 business downturn. Nader assured me that if we got the Meadowlands deal, we could also seriously look at the Palmyra deal.

35. I told my Palmyra contacts that although there was no guarantee we could pursue the deal in Palmyra that I had been working on with DeBartolo, I thought that what we were working on putting together for the Meadowlands could also be duplicated to some extent in Palmyra once we had our retail development system in place to redevelop The Meadowlands into something else like The Mall of America.

36. On Thursday, March 11, 2010, after several days of preparatory calls and discussions with various people involved with the Governor's Office for the State of New Jersey and the New Jersey Sports and Exposition Authority, as well as leaders of both the Democratic and Republic parties in New Jersey, I spoke with Mark Stephaneau to arrange a major conference call with Jon Hanson, who New Jersey Governor Chris Christie had appointed to help him solve the problems associated with Xanadu at The Meadowlands. **[EXHIBIT 4, a business email from Donna Hildebrandt, Nader Ghermezian's personal Corporate Executive Assistant, scheduling this conference call to take place and saying that the call had been arranged by**

me, proves that I arranged this phone call with Jon Hanson, Chairman of the Board of Directors of the New Jersey Sports and Exposition Authority.]

37. I went into Nader's office and let him know I had arranged a conference call with Jon Hanson for 12:30pm Alberta time. Nader said that first we needed to arrange a conference call to decide what to say to Jon, and so we arranged an 11:30pm international conference call with various members of the Ghermezian Family located in Canada and the United States to discuss the overall purpose and objective of the call, which was for me to introduce the Ghermezian Family members to Jon Hanson, who was the representative of the Governor of New Jersey concerning all major issues related to figuring out how to fix Xanadu at The Meadowlands.

38. I introduced all the parties during the 12:30pm phone call, and said that based on my experience in redeveloping major enclosed malls, The Ghermezian Family had hired me as CEO of Triple Five's International Mall Development Group, and that we thought that together we would be able to effectively reposition and redevelop Xanadu at The Meadowlands into a much more successful entertainment driven enclosed mall that would become a major tourist attraction for the State of New Jersey. I went into detail about the various elements comprising both the Mall of America and West Edmonton Mall and how it was our objective at Triple Five to redevelop Xanadu by including some of these more successful elements and to also bring in new much more modern elements to update the concepts that had been so successful at Triple Five's two other major malls. I made pages of extensive notes before, during and after this call and have retained those notes.

39. I went into my background about how I previously redeveloped Riverside Square in Hackensack, New Jersey, very successfully, and that I had been working recently on redeveloping Palmyra, and that I thought by having New Jersey bring in Triple Five with my leading the redevelopment effort, we could be very successful at redeveloping Xanadu in a way that would show how the ultimate goal of Xanadu could still be attained.

40. After the conference call, Nader asked me to write a draft letter to Jon Hanson that would recap our discussion and bring us to the next phase of negotiations to make the deal to takeover Xanadu. That same day, I also sent emails to the head of real estate for Bloomingdale's asking him if he would be interested in the Xanadu project if we could come up with a reasonable plan that he approved of that he thought could succeed. **[EXHIBIT 5 is a draft copy of this letter that I wrote for Nader Ghermezian's signature to Mr. Jon Hanson, Chairman of the New Jersey Sports and Exposition Authority.]**

41. On Friday, March 12, while in the Minneapolis airport flying from Edmonton to Jacksonville, Florida, I called and spoke with Wes Lang, who was one of the members of the Board of Directors of the New Jersey Sports and Exposition Authority, and asked him if he thought he could support our efforts to become involved with the redevelopment of Xanadu. He said yes. I also called and spoke with other Exposition Authority Board Members over the next several days and followed up with emails to them and to Nader and other members of the Ghermezian Family.

42. I flew back to Edmonton on Wednesday, March 17. **[Attached as Exhibit 7 is the Fantasyland Hotel (in West Edmonton Mall Canada across the mall from Triple Five Headquarters) receipt for this period showing me as a "T5 Consultant" but not as an**

employee of Triple Five].   During that week, I continued my correspondence and calls in support of our efforts to get control of Xanadu, and I also concurrently worked on the deals that Nader wanted to do in Libya and the Congo.  **[Attached as EXHIBIT 6 to this Complaint is the printer proof that Nader asked me to look over before he had my business cards printed.  The card said "Senior Vice President" of the International Development Division of Triple Five World Developments Limited, rather than the CEO position Nader had promised me when we met in New York at his Triple Five Riverdale office.]**

43.  On Monday, March 22, Nader and I drove to Calgary, where we met people about another business venture relating to extracting oil from oil sands.  Nader and I had our picture taken together at the Bass Pro in front of the giant fireplace just outside Calgary, and I have retained a copy of that picture of the two of at Calgary.

44.  On Tuesday, March 23, 2010, I met in the Triple Five Headquarters Conference Room with Shawn Gabriel who told me he used to work for Nader on deals, but finally he had to quit working for Nader, even though he liked Nader, because Nader wouldn't pay him.  Since it was getting near the end of March, my first full month with Triple Five, I was becoming increasingly concerned from what I was seeing and hearing that Nader might not pay me either.

45.  I asked Nader if he would mind if brought my son up to Edmonton during my next trip, since it would be my son's Spring Break vacation from school.  Nader said that would be OK.

46.  On Monday, March 29, 2010, I flew back up to Edmonton with my son.  On Friday, April 2 of that same week, my son and I met with Nader and his sons Justin and Daniel in the conference room at Triple Five for three hours, from 3pm to 6pm.

47.  The first thing I brought up was:  Where was my check for $12,000 that Nader had promised me in New York to get me to take the job as CEO, make the deal for Xanadu, and travel internationally for him making other big mall deals for Triple Five.   With my son and his two sons present in the conference room, Nader said that he didn't like to pay money until he was making money and he said he wasn't going to pay me anything until we started making money on the projects.  I told him that was not the deal and that he had said before we left New York that he was going to have our agreement prepared right away when we got to Canada, but he never did it.

48.  I told him I had done what I promised and introduced him and his family to the New Jersey Sports and Exposition Authority and the Governor of New Jersey through Jon Hanson, and that I had also followed up with the Board Members for the Exposition Authority and Jon Hanson to further discuss and elaborate upon the business structure and timing of the deal.

49.  I told Nader and his sons that I had shown him that no deal had been made with The Related Group, even though the Exposition Authority had been ready to make that deal with them before I convinced New Jersey that my heading up the deal for Triple Five and Triple Five's background with Mall of America would be the perfect combination for what they needed to turn Xanadu around.

50.  Nader said yes, that was all true, and he appreciated it, but no money was coming in yet, and so he wasn't going to pay me.  I told him that wasn't the deal, and he said again that he wasn't going to pay me the promised monthly amount of $12,000.00 even though he agreed he had promised me that he would pay me monthly when we met in New York.

51. Nader then said I could use his Range Rover to drive to the Jasper National Park for my son's ski trip that weekend that we had arranged. I told him I was going to rent a car, but Nader insisted that I take his Range Rover instead.

52. On Tuesday, April 6, 2010, my son and I flew back to the United States from Canada. As a business lesson, since my son was in my last formal meeting with Nader at Triple Five's Headquarters, I told my son on the way back home on the plane that a person can't work for someone who won't keep his promise and won't pay him when he said he would. I explained to him that a person who won't pay you once when he says he will probably won't pay you later either, and that I couldn't justify being away from my son for so long to work on projects when Nader said he now wasn't going to pay me after he originally agreed to pay me. Based on Nader's failure to pay even the $12,000 he had agreed to pay, I certainly couldn't count on him to pay the 10% he would later owe me for Xanadu when that deal finally got done. Later in April, 2010, Nader called me on the phone and literally repeatedly begged me to fly back to Canada to continue working for him on Xanadu and other projects, but I told him I would not come back because he was not paying me as he had promised to do in New York in February, 2010. After that, Nader began to make up stories about me to explain why I was no longer working in Canada for him.

53. Since then, the State of New Jersey and Triple Five announced that they signed the deal for Triple Five and the Ghermezian Family to take over Xanadu **[EXHIBIT 8, a Bloomberg news report dated December 23, 2010, announcing "New Jersey's Xanadu Taken Over by Mall of America Owner Triple Five" shows the value of Xanadu as being "about $2 billion" counting only the amount the previous owners had invested in the complex without even including the value of the land itself.]**

54.   I called Nader and Don Ghermezian and asked them if I could help them work on Xanadu the way we originally agreed I would lead the redevelopment of the project when I first met with Nader and Raphael Ghermezian in New York.   I received an email from Don Ghermezian saying he was doing it and they didn't need me.

55.   In response to one of my emails, which was dated April 30, 2011 [**Attached to this Complaint as EXHIBIT 9**], to Nader, Don, and Raphael Ghermezian, Nader wrote back a slanderous email that he sent in-house to a large group of people who worked for him, including his attorney, saying I was a "crook."   The same thing he said about another respected member of the development business—Mark London--who Nader sent to work in Nigeria and then didn't pay him what he had originally promised him either.

56.   While I was in Canada, I learned that Nader had also hired Norman Krone, previously head of Walgreens Real Estate Department in Chicago, and also another former employee of DeBartolo Development.   Nader told Norm Krone that he was putting Norm in charge of mall development in China for Triple Five.   I spoke to Norm at the International Council of Shopping Centers Law Conference in Orlando last October, and Norm told me that Nader had not paid him the money he had promised him either, nor had Nader even paid all the operating expenses he had promised to pay Norm for working in China for Triple Five for over three years.

## PLAINTIFF'S PRAYER FOR DAMAGES AND EQUITABLE RELIEF

57.   Nader's and Triple Five's failure to pay Mark London and Norm Krone,      after Nader promised to pay them, in the same way he promised to pay me, but did not pay me,

constitutes two similar predicate acts of fraud in violation of the United States Federal and New York Racketeering Influenced and Corrupt Practices (RICO)Act and related statues. Therefore, the amount of damages to which I am entitled, which is in excess of TWO HUNDRED MILLION DOLLARS should be trebled, so that the amount of damages to which I am entitled for breach of contract and Nader's fraud in the procurement of that contract is in excess of SIX HUNDRED MILLION DOLLARS ($600,000,000.00) and in that specific greater amount to which the Court shall find that I am entitled after TRIAL BY JURY.

58.  As the Plaintiff, I respectfully request and demand the trial of all issues in this case by a jury.

59.  As special equitable relief, I request that the Court order that Triple Five and the other Ghermezian Family Defendants, including but not limited to Donald Ghermezian, Nader Ghermezian and Raphael Ghermezian be removed from the redevelopment, operation and management of The American Dream, after judgment for more than SIX HUNDRED MILLION DOLLARS is rendered against them, which they shall nevertheless be required to pay me, and that I be placed in charge of the redevelopment of The American Dream--*as its Trustee on behalf of the State of New Jersey and the New Jersey Sports and Exposition Authority*--as originally promised by Nader and Raphael Ghermezian in my meetings with them in New York in February, 2010.

60.  They made these promises fraudulently to induce me to move to Canada to help them get the cooperation of the State of New Jersey, Colony Capital, LLC, and the New Jersey Sports and Exposition Authority--and they encouraged all of these other organizations in the belief that I would be leading the redevelopment of Xanadu for Triple Five.

61. Since Triple Five, Nader Ghermezian, Raphael Ghermezian and Donald Ghermezian procured their deal with the government of New Jersey and Colony Capital, LLC, by virtue of their fraud upon me and their fraud upon the government, including the New Jersey Sports and Exposition Authority and The State of New Jersey, and Colony Capital, LLC, itself, they should not be permitted to retain the benefits of their fraudulent conduct.

62. The Defendants are estopped to deny the Plaintiff's claims because they promised to pay the Plaintiff as described above in this Complaint, the Plaintiff relied upon their promises by giving up other gainful employment, and immediately moving to Canada to live and work in Canada at the Triple Five Headquarters specifically at the request of Nader Ghermezian.

63. Furthermore, the Plaintiff was led to believe he would be working as an employee of Triple Five, but Triple Five further defrauded the Plaintiff by calling him a consultant and then failing to ever pay even one dollar of the salary that the Plaintiff was promised. This is in violation of State, Federal and Local employment laws and the Plaintiff should also be compensated for this.

64. Moreover, the Defendants should also be required to pay the originally promised $12,000 per month salary beginning on March 1, 2010, until that date when the Court awards judgment to Plaintiff against Defendants for the amount the jury determines the Plaintiff should be paid based on this Complaint.

65. Indeed, even under the principles of Quantum Meruit, I am entitled to be paid for the value of the benefit received by the Defendants as the result of my bringing Triple Five and The Ghermezian Family together with Jon Hanson, Chairman of the New Jersey Sports and Exposition Authority, and the Office of the Governor of New Jersey, to enable them to

successfully take over Xanadu.  All of the evidence will show that I was the procuring cause of

this transaction, that Triple Five and Ghermezian Family did not know how to outflank the

competition and could not have achieved their objective of taking over Xanadu had I not agreed

to help them and had I not enabled them to do so by working from their offices in Canada to

effect the deal on their behalf.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally,

in the sum of more than SIX HUNDRED MILLION DOLLARS $600,000,000.00, plus interest

from the date of the closing of the purchase/ground lease assignment of The American Dream by

the Defendants, along with costs and disbursements, and attorneys' fees, together with any other

relief the Court and Jury find to be just and proper.

Dated:  May 10, 2013

Mark J. Podlin, Plaintiff and Attorney for Plaintiff

MARK J PODLIN ATTORNEY AT LAW, P.C.
407 Butler Avenue
P.O. Box 20989
St. Simons Island, GA  31522
(912) 571-1873
markpodlin@yahoo.com

## LIST OF EXHIBITS CITED WITHIN THE FOREGOING COMPLAINT

THE FOLLOWING LIST OF NINE EXHIBITS TO THE COMPLAINT IS HEREBY
MADE A PART OF THIS COMPLAINT.  ALL OF THE ATTACHED AND LISTED
EXHIBITS (AS WELL AS THE FOREGOING REFERENCES TO THEM FOUND IN
THE COMPLAINT) ARE HEREBY INCORPORATED BY REFERENCE IN THE
COMPLAINT AS IF RECITED VERBATIM WITHIN THE COMPLAINT ITSELF AND
THE  DESCRIPTION  OF  EACH  EXHIBIT  THAT  FOLLOWS  IS  ALSO
INCORPORATED BY REFERENCE INTO THE COMPLAINT AND MADE A PART
OF THE COMPLAINT.

EXHIBIT 1—TRIPLE FIVE WORLDWIDE ORGANIZATION, LLC
GENERAL CONFIDENTIALITY, NON-CIRCUMVENTION AND
NON-COMPETITION AGREEMENT dated February 24, 2010

EXHIBIT 2—Email dated March 1, 2010, from Nader Ghermezian's personal Corporate
Executive Assistant, Donna Hildebrandt, requesting a room reservation for Plaintiff Mark
Podlin for 11 nights at the Fantasyland Hotel (attached to West Edmonton Mall across the
mall from Triple Five's International Headquarters Offices) and the billing of that room
directly to Triple Five, rather than to Mark Podlin.

EXHIBIT 3—

REDACTED

EXHIBIT 4—March 11, 2010, Internal Triple Five Email from Nader Ghermezian's
personal Corporate Executive Assistant, Donna Hildebrandt, to the key decisionmakers at
Triple Five saying that "Mark Podlin has arranged for a conference call with the
Chairman of the Committee in charge of Xanadu, Mr. Jon Hanson."

EXHIBIT 5—March 11, 2010, Letter drafted by Mark Podlin to Jon Hanson, Chairman of
the Committee in charge of Xanadu, for signature by Nader Ghermezian, which was
written by Mark Podlin after the conference call on March 11, 2010, with Jon Hanson
referenced by EXHIBIT 3, described above.

EXHIBIT 6—Triple Five Worldwide Developments Limited business card proof, approved
and ordered by Nader Ghermezian, showing Mark J. Podlin, the Plaintiff, as "Senior Vice
President" of the International Development Division instead of the position of Chief
Executive Officer, which Nader Ghermezian originally promised to Mark J. Podlin during
their meeting in February, 2010, at Triple Five's New York Riverdale Offices.

EXHIBIT 7—FANTASYLAND HOTEL (at West Edmonton Mall in Canada) receipt
showing Mark Podlin as a "T5 Consultant" under the Company name.

EXHIBIT 8—BLOOMBERG internet news article dated December 23, 2010, stating that
"Triple Five, owner of the Mall of America in Minnesota, will take over development of
New Jersey's stalled Meadowlands Xanadu shopping and entertainment complex" and that
". . . Earlier owners invested about $2 billion in the complex," which substantiates
Plaintiff's claim that Xanadu was worth *at least* $2 billion and that he is entitled to at least
10% of that amount pursuant to his agreement with Nader Ghermezian in February, 2010,
at their New York Riverdale Triple Five offices.

EXHIBIT 9—Email dated April 30, 2011, from Mark Podlin to Don Ghermezian, Raphael Ghermezian, and Nader Ghermezian, saying: "Congratulations on completing the deal for Xanadu that I originally secured for you by contacting the Board and Governor's offie to enable you to step into the deal in place of The Related Companies. . . . Meanwhile, we still need to confirm the ten percent compensation agreement that I agreed to with Nader for putting you in the winning position when I met with him and Raphael in New York last February 2010."

## VERIFICATION

Mark J. Podlin, being duly sworn, deposes and says:

I am the Plaintiff in the above entitled action. I have myself written and then re-read the foregoing Complaint and know the contents thereof. The same are true to my knowledge, except as to matters stated to be alleged on information and belief, and, as to those matters, I believe them to be true.

_____
Mark J. Podlin
Plaintiff

Sworn to before me this
___ day of May, 2013.

_____
NOTARY PUBLIC

successfully take over Xanadu. All of the evidence will show that I was the procuring cause of this transaction, that Triple Five and Ghermezian Family did not know how to outflank the competition and could not have achieved their objective of taking over Xanadu had I not agreed to help them and had I not enabled them to do so by working from their offices in Canada to effect the deal on their behalf.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in the sum of more than SIX HUNDRED MILLION DOLLARS $600,000,000.00, plus interest from the date of the closing of the purchase/ground lease assignment of The American Dream by the Defendants, along with costs and disbursements, and attorneys' fees, together with any other relief the Court and Jury find to be just and proper.

Dated: May 10, 2013

Mark J. Podlin, Plaintiff and Attorney for Plaintiff

MARK J PODLIN ATTORNEY AT LAW, P.C.
407 Butler Avenue
P.O. Box 20989
St. Simons Island, GA 31522
(912) 571-1873
markpodlin@yahoo.com

## LIST OF EXHIBITS CITED WITHIN THE FOREGOING COMPLAINT

**THE FOLLOWING LIST OF NINE EXHIBITS TO THE COMPLAINT IS HEREBY MADE A PART OF THIS COMPLAINT. ALL OF THE ATTACHED AND LISTED EXHIBITS (AS WELL AS THE FOREGOING REFERENCES TO THEM FOUND IN THE COMPLAINT) ARE HEREBY INCORPORATED BY REFERENCE IN THE COMPLAINT AS IF RECITED VERBATIM WITHIN THE COMPLAINT ITSELF AND THE DESCRIPTION OF EACH EXHIBIT THAT FOLLOWS IS ALSO INCORPORATED BY REFERENCE INTO THE COMPLAINT AND MADE A PART OF THE COMPLAINT.**

# Exhibit 1

# TRIPLE FIVE WORLDWIDE ORGANIZATION, LLC

## GENERAL CONFIDENTIALITY, NON-CIRCUMVENTION AND NON-COMPETITION AGREEMENT

To:   TRIPLE FIVE WORLDWIDE ORGANIZATION LLC and all companies, corporations and entities that are related to or associated or affiliated with it or the Ghermezian family, and their directors, officers and employees, and all members of the Triple Five group of companies, and all subsidiaries, successors and assigns of the foregoing, and the following entities (if any _____ (individually and collectively, the "Disclosing Party" or "Triple Five" or "T5").

The undersigned (the "Recipient") wishes to receive information from the Disclosing Party for purposes which include the following: any information obtained by the Recipient or disclosed to the Recipient by, or on behalf of, the Disclosing Party, directly or indirectly, for any reason which may be related to any business matter(s) or services whatsoever, including but not limited to any economic opportunity resulting from disclosure of information with respect to the Disclosing Party's interests in any real estate, or otherwise anywhere (the "Purpose"). Therefore, to ensure that all information the Disclosing Party provides to the Recipient or is obtained by the Recipient remains confidential and protected (whether or not such information relates to the Purpose), and in consideration of the Disclosing Party disclosing the Confidential Information (hereinafter defined) to the Recipient, the Recipient agrees as follows:

1.   "Affiliates" means (where the Recipient is an individual) where the Recipient directly or indirectly (in respect of a company or corporation) has an interest in the share capital in that company or corporation and any trust or other entity or organization with which the Recipient is directly or indirectly associated (by reason of the Recipient being entitled, directly or indirectly, to exercise or control the exercise of any voting power of the decision-making body of such trust or other entity or organization or any person, company, corporation, trust or other entity or organization with which the Recipient has an agreement or understanding relevant to the Purpose, the Confidential Information or any part thereof); or (where the Recipient is a company or corporation) means any subsidiary or holding company of the Recipient and any subsidiary of any such holding company, and any other company or corporation in which the Recipient has an interest in the share capital, and any trust or other entity or organization with which the Recipient is directly or indirectly associated (by reason of the Recipient being entitled, directly or indirectly, to exercise or control the exercise of any voting power of the decision-making body of such trust or other entity or organization or any person, company, corporation, trust or other entity or organization with which the Recipient has an agreement or understanding relevant to the Purpose, the Confidential Information or any part thereof).

2.   "Confidential Information" means all information and ideas of the Disclosing Party relevant to the Purpose or any other issue or relationship or matter whatsoever, disclosed by the Disclosing Party and whether disclosed before, on or after the date hereof including all such information and ideas in electronic, written and verbal form and including without limitation, the following:

(a)   technical, financial, business, customer, product and costing information and models, data, techniques, designs, programs, plans, processes, procedures, "know how", studies, contracts, budgets, forecasts, strategies, marketing techniques and materials relevant to the current or proposed business plans, development plans and financial opportunities of the Disclosing Party, reports, market projections or other information or data storage systems which contain such information;

(b)   information disclosed, either directly or indirectly, by permitting the Recipient or its directors, employees, agents or advisors to observe or review various operations or processes conducted by the Disclosing Party;

(c)   information pertaining to the Disclosing Party and its directors, officers, employees, agents or representatives; and

(d)   all agreements, data, information, records, materials and representations designated by the Disclosing Party as being confidential.

EXHIBIT 1

1

but Confidential Information does not include information that:

    (e)    is disclosed in good faith to the Recipient by a third party which the Recipient believes had legitimate possession and the right to make such disclosure after due inquiry conducted by the Recipient;

    (f)    was already known by the Recipient (and which the Recipient can lawfully prove) without any obligation of confidence to the Disclosing Party prior to disclosure; or

    (g)    was developed independently by the Recipient without use of any of the Disclosing Party's information.

3.    The Recipient covenants to the Disclosing Party that the Recipient shall (and shall procure that the Recipient's Affiliates will) protect and safeguard the disclosed Confidential Information and not, by any means whatsoever, disclose or allow unauthorized use, disclosure, dissemination or publication of the Confidential Information to any person, whether direct or indirect, except:

    (a)    as compelled by judicial or administrative order or decree, provided that the Recipient gives immediate written notice of any request for disclosure to the Disclosing Party, and takes all reasonable steps to maintain confidentiality by the Court or administrative body;

    (b)    to those of its directors, officers and employees that have a need to know the Confidential Information (and who are informed by the Recipient of the confidential nature of the Confidential Information);

    (c)    to its legal and financial advisors, auditors, bankers and any other consultant or advisor on a confidential basis, provided however that such consultants, advisors, auditors and bankers shall keep confidential the Confidential Information to the same extent as required of the Recipient hereunder and notwithstanding said requirement, the Recipient hereby agrees that it shall be responsible for and liable to the Disclosing Party for the acts and omissions of such consultants, advisors, auditors and bankers as if such acts and omissions were the acts and omissions of the Recipient, and provided that said requirement of such consultants, advisors, auditors and bankers shall not affect or release the Recipient from its liabilities and responsibilities hereunder; or

    (d)    with the prior written consent of the Disclosing Party, which consent may be unreasonably withheld and subject to the third party entering into a written confidentiality, non-circumvention and non-competition agreement(s) with the Disclosing Party, on the terms and conditions required by the Disclosing Party.

4.    The Recipient covenants to the Disclosing Party that the Recipient shall (and shall procure that its directors, employees, agents and Affiliates will):

    (a)    use the Confidential Information solely for the purpose of evaluating all relevant issues in connection with the Purpose and for no other purpose whatsoever except where the Disclosing Party's written authorization is first obtained (and in particular, without prejudice to the generality of the foregoing, not to make any commercial use of the Confidential Information or any part thereof);

    (b)    except to the extent required by applicable law, promptly return to the Disclosing Party, upon request, any and all materials concerning any Confidential Information, including all copies made, whether such material was made or compiled by the Recipient or furnished by the Disclosing Party, it being specifically understood that the obligations of the Disclosing Party to return all such materials shall survive the expiration or termination of this Agreement;

    (c)    take all reasonable precautions, and in any event not fewer than those precautions used to protect its own confidential information, to keep the Confidential Information in the strictest confidence and to protect it from disclosure, subject to paragraph 3 above;

    (d)    not reproduce or copy in whole or in part any Confidential Information except as may be necessary for the purposes of evaluating and compiling it for the better analysis of it;

(e)    not in any manner whatsoever, whether directly or indirectly, use, or cause, permit or assist others to use, any Confidential Information or any information and ideas of the Disclosing Party relevant to the Purpose or any matters related thereto or any other matters or contents herein which may become available in the public domain after the date hereof;

(f)    notwithstanding anything to the contrary, not in any manner whatsoever, whether directly or indirectly, circumvent, or cause, permit or assist others to circumvent, the Disclosing Party in respect of the Purpose, the Confidential Information or any matters related thereto, or any other matters or contents herein ("Non-Circumvention").

5.    Notwithstanding anything to the contrary, commencing on the date of this Agreement the Recipient agrees not to compete with the Disclosing Party, directly or indirectly, in any way whatsoever including, but not limited to, conducting any business, entering into any business relationship or receiving any compensation, remuneration, ownership interest or benefit whatsoever with respect to any business venture which competes with the Purpose ("Non-Competition"). Further, the Recipient agrees that he/it will not use the intellectual property, name or goodwill of the Disclosing Party in any manner whatsoever without the prior written consent of the Disclosing Party. The Recipient shall not use the Confidential Information, relationships or goodwill of the Disclosing Party in any manner whatsoever to take business away from the Disclosing Party or otherwise compete or interfere with the business of the Disclosing Party.

6.    This Agreement is not intended to and does not obligate either party to enter into any further agreements or to proceed with any transaction in connection with the Purpose or otherwise.

7.    The Recipient understands and agrees that all information provided by the Disclosing Party hereunder is provided as is and without any representation or warranty, whether express or implied, as to its accuracy or completeness.

8.    The Recipient acknowledges and agrees that the Disclosing Party could be significantly and permanently injured or prejudiced by the unauthorized use, disclosure, dissemination, publication or reproduction of the Confidential Information or any part thereof. The Recipient specifically acknowledges and agrees that damages may not be an adequate remedy in respect of the breach by the Recipient of this Agreement and that, in addition to damages, injunction or other legal or equitable remedies may be appropriate.

9.    In the event that the Recipient or any party to whom the Recipient transmits the Confidential Information as permissible under this Agreement, becomes legally compelled by court decision or governmental order to disclose any of the Confidential Information, the Recipient shall provide the Disclosing Party with prompt written notice so that the Disclosing Party may seek a protective order or other appropriate remedy and / or waive compliance with the provisions of this Agreement.

10.    The Recipient agree that they will not disclose or permit to be disclosed to any person other than their respective legal and financial advisors, auditors, bankers and any other consultant or advisor on a confidential basis, that discussions or negotiations are taking place or have taken place concerning the Purpose or the Confidential Information.

11.    (a)    This Agreement is effective from the date signed hereunder by the Recipient.

(b)    This Agreement is personal to the Recipient and the Recipient may not assign this Agreement, except with the prior written consent of the Disclosing Party, which consent may be unreasonably withheld. The Disclosing Party may, in its sole discretion, assign this Agreement without the prior consent of, or notice to, the Recipient.

(c)    Any notices required under this Agreement shall be in writing and hand delivered, mailed, e-mailed or sent by facsimile transmission to the addressee at the following addresses, e-mail addresses or fax numbers, as the case may be:

    (i)    To the Disclosing Party:    Triple Five
Attention: Nader Ghermezian
Address: #3000, 8882 – 170 Street,
Edmonton, Alberta Canada T5T 4M2

Tel: (780) 444-8100
Fax: (780) 444-5232
Email: Nader@triplefive.com

    (ii)    To the Recipient (please write in capital letters):

Name: *MARK PODLIN*
Address: *PO BOX 20289, ST SIMONS ISLAND, GA 31522*
Tel: *912-571-1873*
Fax:
Email: *markpodlin@gmail.com*

(d)    If any dispute, controversy, or claim arises between the Parties regarding the interpretation or validity of this Agreement or any other matter relating to or arising out of this Agreement, then either Party may submit the dispute to the exclusive jurisdiction of the Courts of the State of Nevada for final determination in accordance with the laws of the State of Nevada, including applicable laws of the United States of America applicable therein.

(e)    This Agreement is binding upon the parties hereto, their successors and permitted assigns.

(f)    This Agreement is the entire agreement concerning the confidentiality of the Confidential Information. In the event that any term of this Agreement is invalid, illegal or otherwise unenforceable, then that term shall be severed and the remainder of this Agreement shall survive and be of full force and effect.

(g)    Failure or delay by either party in exercising any right or remedy under this Agreement will not in any circumstances operate as a waiver of it, nor will any single or partial exercise of any right or remedy in any circumstances preclude any other or further exercise of it or any other right or remedy.

12.    Notwithstanding anything to the contrary, this Agreement shall remain in effect until terminated by the Disclosing Party in writing, provided however that this Agreement shall not be terminated on a date that is less than five (5) years after the date hereof, and provided always however that the obligations of the Recipient hereunder with regard to Non-Circumvention, Non-Competition and Confidential Information provided to the Recipient or obtained by the Recipient, directly or indirectly, prior to such termination shall survive the termination of this Agreement.

13.    This Agreement may, upon execution by the Recipient, be delivered by e-mail or facsimile transmission and such delivery shall constitute due execution and delivery of this Agreement, provided that the originally executed version of this Agreement shall be delivered as soon as possible after said delivery by e-mail or facsimile transmission.

DATED this *24th* day of *February*, 20*10*
Name (in capital letters):

Signature: _____
Duly authorized to sign for and on behalf of the Recipient

Witness: *MARK J. PODLIN*
    Print Name: _____

# Exhibit 2

Friday & Saturday - $209 T5 Rate

Billing – Room and Taxes only to T5...Guest pays own incidental charges

---

**From:** Donna Hildebrandt
**Sent:** Monday, March 01, 2010 1:37 PM
**To:** Marilyn Fulay
**Cc:** Nader Ghermezian
**Subject:** Room Request March 1-12

Hello,

As per Nader Ghermezian - can you kindly reserve a room for the following:

Mark Podlin

Standard Room, NS

Check in Mon March 1/Check out Friday March 12 (11 nights)

Room and Taxes only billed to T5

Thank you~

*Donna Hildebrandt*

*Corporate Executive Assistant*

*Triple Five Worldwide Organization, LLC*

Suite 3000, 8882-170 Street

Edmonton, Alberta

Canada  T5T 4M2

Ph (780) 444-8100 Extension 8124

Fax (780) 444-5232

Cell (780)938-8124

Email  donna.hildebrandt@triplefive.com

Web  www.triplefive.com

🖶 Please consider the environment before printing my email

# EXHIBIT 2

# Exhibit 3

# FILED UNDER SEAL
# PURSUANT TO
# COURT ORDER

# Exhibit 4

Subject:   Fwd: IMPORTANT! CONFERENCE CALL – XANADU Thu Mar 11 @ 1130AM Edm/130pm NY

From:   mark podlin (markpodlin@gmail.com)

To:   markpodlin@yahoo.com; markpodlin@podlin.com; randilaferney@yahoo.com;

Date:   Sunday, May 1, 2011 12:47 AM

---------- Forwarded message ----------
From: Donna Hildebrandt <dhildebr@westedmontonmall.com>
Date: Thu, Mar 11, 2010 at 1:11 PM
Subject: IMPORTANT! CONFERENCE CALL - XANADU Thu Mar 11 @ 1130AM Edm/130pm NY
To: Nader Ghermezian <Nader.Ghermezian@wem.ca>, Martin Walrath <Martin@triplefive.com>,
Raphael Ghermezian <R.Ghermezian@triplefive.com>, Don Ghermezian <Don@wem.ca>,
"markpodlin@gmail.com" <markpodlin@gmail.com>, Mark Podlin <mark.podlin@triplefive.com>
Cc: G1 <G1@wem.ca>

Hello Everyone~

**We will have a conference call re: Xanadu today <u>Thursday March 11 @ 1130am Edm/130pm NY</u>
to discuss the following:**

Mark Podlin has arranged for a conference call with the Chairman of the Committee in charge of
Xanadu, Mr. Jon Hanso. Mr. Hanson is one of the key people who will give recommendation to
the Governor. This call will take place today **Monday March 11, 2010 @ 1230pm
EDMONTONT/230pm NEW YORK.** They have indicated that they are **very excited to hear
from us and that they feel we are the solution** and that there is still time to deal with us instead
of Related.

<u>Please note</u> that while **G1 is invited to listen** in on the call today Thursday March 11 @ 1230pm
Edmonton/230pm NY – the only people to be to participate in the discussion are Nader, Raphael,
Martin Walrath, Don Ghermezian and Mark Podlin.

The MODEL will be for the Government to take over the project and provide it to T5 and then
for us to build a project that is a combination of WEM and MOA. **Please note:** we caution you
to **not to make any commitment to investment by T5 and not to bring up the subject of us
investing**, but if forced to discuss, we should indicate that investment would be dependent on the
type of deal proposed to us.

EXHIBIT 4

# Exhibit 5

March 11, 2010

Dear Jon,

Thank you for taking the time to talk with us today on the phone.

Triple Five is very interested in finding an appropriate way to become involved in opening, operating, repositioning, and redeveloping Xanadu at The Meadowlands, subject, of course, to the rights and interests of all the parties, like Colony Capital, who currently have standing and a ground lease with the New Jersey Sports and Exposition Authority and the State of New Jersey.

We appreciate the sensitive nature of this process of improving and modifying the course that Xanadu has taken, and recognize the complexity of all the issues and the value all the interested parties have contributed.

If we could somehow become involved in the Xanadu project in a way that would be fair to everyone currently holding a position in the project, Triple Five would be very enthusiastic about participating in evolving Xanadu into a financially successful development that will include many of the trademark features that Triple Five is known for at its other very successful projects—The Mall of America in Minneapolis and West Edmonton Mall in Canada.

Our Galaxyland indoor roller coaster amusement park, ice skating rink, indoor Waterpark, indoor lake with an aquarium surmounted by a full scale replica of the Santa Maria on top of the lake and a navy of submarines under the water—these are just some of the concepts we can bring to a new vision of Xanadu.

In addition to these very successful entertainment and amusement elements that we own and operate, we have even more new ideas that we believe would make Xanadu our world flagship and an attraction of international renown.

We believe that progress in helping the project can best be made through constructive and creative discussions that would include members of your Committee and the other parties holding an interest in Xanadu, so that we can all cooperate in finding the right solution consistent with current property interests and the people of the State of New Jersey.

We hope that we will be able to make arrangements soon that will lead to progress in helping Xanadu find its way into a new era of success and excitement.


Sincerely yours,

Nader Ghermezian


EXHIBIT 5

# Exhibit 6

V3



Mark J. Podlin
Senior Vice President
International Development Division

www.triplefive.com

# TRIPLE FIVE WORLD DEVELOPMENTS LIMITED

Suite 3000
8882-170 Street
Edmonton, Alberta, Canada T5T 4M2
Ph: 780-443-8244
Cell: (917) 208-7502
Fax: 780-444-5232

email:  mark.podlin@triplefive.com

EXHIBIT 6

# Exhibit 7



**FANTASYLAND HOTEL**
AT WEST EDMONTON MALL, EDMONTON, CANADA

17700-87TH AVENUE
EDMONTON AB  T5T 4V4
780-444-3000   800-737-3783
GST Reg# 845861368 RT

| | |
|---|---|
| Name: PODLIN, MARK | Account: 11001339581 |
| Address: | Room: 428 |
| City, Prov, Pcode: X  X  X | Room Type: SUPERIOR NON-SMOKING 2 BEDS |
| | Rate Plan: COMP. |
| Phone: 917 2087502 | Adults/Children: 1 / 0 |
| Company: T5 CONSULTANT | Arrival Date: Wednesday, March 17, 2010 |
| | Departure Date: Wednesday, March 24, 2010 |

| Date | Description | Reference | Charges/Credits |
|---|---|---|---|
| 3/17/2010 | L2 GRILL | 428/4168/21:11/L2 GRILL | $28.50 |
| 3/19/2010 | EUROPA CAFE | 428/8111/11:41/EUROPA CAFE | $14.60 |
| 3/19/2010 | ROOM SERVICE | 428/4684/18:33/ROOM SERVICE | $7.30 |
| 3/19/2010 | L2 GRILL | 428/4190/20:47/L2 GRILL | $57.60 |
| 3/20/2010 | EUROPA CAFE | 428/8271/12:36/EUROPA CAFE | $14.60 |
| 3/20/2010 | L2 GRILL | 428/4210/21:58/L2 GRILL | $27.50 |
| 3/22/2010 | EUROPA CAFE | 428/8508/08:18/EUROPA CAFE | $14.60 |
| 3/23/2010 | EUROPA CAFE | 428/8618/09:52/EUROPA CAFE | $16.00 |
| 3/23/2010 | L2 GRILL | 428/4251/21:55/L2 GRILL | $16.00 |
| | | **Balance Outstanding:** | **$196.90** |

---

Please sign and detach this stub and return it to the express checkout at the front desk along with your room keys.
A final folio will be printed and mailed to you within 24 hours of your departure.

| | Card Type | Card Number |
|---|---|---|
| Name: PODLIN, MARK | AX | XXXX XXXX XXXX 1007 |
| Address: | | |
| City, Prov, Pcode: X  X  X | | |
| Phone: 917 2087502 | My signature authorizes all charges be billed to my credit card. |
| Company: T5 CONSULTANT | |
| Account: 11001339581   Room: 428 | Guest Signature : _____     Date: _____ |

*EXHIBIT 7*

# Exhibit 8

# Bloomberg

## New Jersey's Xanadu to be Taken Over by Mall of America Owner Triple Five

By Terrence Dopp and Prashint Gopal - Dec 23, 2010

Triple Five, owner of the Mall of America in Minnesota, will take over development of New Jersey's stalled Meadowlands Xanadu shopping and entertainment complex as lenders seek to revive the project.

Triple Five signed a letter of intent with the lender group under a plan that is supported by New Jersey Governor Chris Christie, according to a joint statement today. Creditors took control of the project in August from a group led by Colony Capital LLC after delays in construction.

Earlier owners invested about $2 billion in the complex, which sits about 10 miles west of Manhattan near New Jersey's Meadowlands sports complex, home of the National Football League's New York Giants and New York Jets. The announcement is the first move toward the lenders' goal of having the complex "open and flourishing" in advance of the 2014 NFL Super Bowl, which will be played at the New Meadowlands Stadium.

"A successful entertainment destination will attract millions of locals and tourists to the area, create jobs and generate substantial tax revenues," Paul Ghermezian, senior vice president of Triple Five, said in the statement.

Triple Five plans to make design changes to the system of rectangular, blue interlocking blocks that make up Xanadu's exterior shell, Maureen Hooley Bausch, a spokeswoman for the Alberta-based company, said in a telephone interview today.

Interior Redesign

Bausch, who declined to provide financial details of the deal, said the complex will also undergo an interior redesign and is targeted to open in 2013 or 2014. She said initial plans are to include all aspects of the original design, such as the ski slope and Ferris wheel, though a final decision hasn't been made. More details will be released next year, the company said.

*EXHIBIT 8*

# Exhibit 9

Sent: Saturday, April 30, 2011 08:59 AM
To: Don Ghermezian; Nader Ghermezian; Markpodlin@yahoo.com <Markpodlin@yahoo.com>; Raphael Ghermezian
Subject: Triple Five Reaches Deal With NJ On Xanadu

You have been sent this message from Mark Podlin as a courtesy of globest (http://www.globest.com).
Dear Don, Nader, and Raphael, Congratulaions on completing the deal for Xanadu I originally secured
for you by contacting the Board and Governor's office to enable you to step into the deal in place of The
Related Companies. I would like to once again offer my continuing services to you in seeing this project
to Grand Opening. Meanwhile, we still need to confirm the ten percent compensation agreement that I
agreed to with Nader for putting you in the winning position when I met with him and Raphael in New
York last February 2010. I know you have been busy, but would appreciate your finalizing this with me
now. Thanks. Mark The entire article may be viewed at
http://www.globest.com/news/1903_1903/newjersey/309643-1.html Triple Five Reaches Deal With NJ
On Xanadu April 29, 2011 By Debra Hazel

EAST RUTHERFORD, NJ—It may have taken 15 years, but Canada's Triple Five Corp. may finally
have found its "American Dream" in the building New Jersey Gov. Chris Christie once called "the
ugliest building in New Jersey, and possibly, America." The Canadian developer has reached an
agreement with the Christie administration to complete the much-loathed Xanadu Meadowlands
complex and rename it to the "American Dream at Meadowlands."

According to the agreement, Triple Five will complete and expand the complex, now 2.4 million square
feet, to 3 million square feet. Plans call for a new façade, an interior renovation and the addition of an
indoor park and skating rink. The project will open in phases beginning in 2013.

Triple Five is the developer of the West Edmonton Mall in Edmonton, Alberta, Canada, at one time the
world's largest, and the Mall of America in Bloomington, MN. American Dream was the name of a
retail/entertainment/hotel project Triple Five proposed in Silver Spring, MD, in the mid-1990s. Plans
called for 650,000 square feet of retail, an indoor hockey arena, IMAX theater and hotel, among other
elements. However, that project was terminated in late 1996 by Montgomery County, which claimed the
project would require too much public financing.

"They like that name and they've had it for a long time," Maureen Bausch executive VP of business
development of Mall of America tells GlobeSt.com. "They've been watching this project since its
inception."

There's been a lot to watch. The Mills Corp. began the development in 2004, but ran into financial
problems, and later was acquired by Simon Property Group. Colony Capital took over the project in
2006, but construction delays, caused in part by the 2008 bankruptcy of Lehman Brothers, led to
creditors taking over the center in August 2010. Triple Five signed a letter of intent to take on the
development in December, and has been working with several architects since January, Bausch
says. "We'll have to change a lot of the interior," she says. "It's dated."

The completion of American Dream at Meadowlands will create some 8,900 construction jobs and up to
30,000 to 35,000 jobs when the project opens, Bausch says. Reports that the development will cost $1
billion are not accurate, she adds. "We just don't know yet," she says. The company will hold a media
conference on Tuesday that will offer more information, Bausch says.

The news, lauded by Jim Kirkos, CEO of the Meadowlands Regional Chamber and the Meadowlands
Liberty Convention and Visitors Bureau, is seen as a boon for the area. "We couldn't be more pleased
that the Meadowlands now has a partner who understands its potential as a destination," Kirkos says in a

EXHIBIT 9