UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

MARK J. PODLIN and PODLIN
INTERNATIONAL REALTY, LTD.,

                    Plaintiffs,

        -against-

NADER GHERMEZIAN, DONALD
GHERMEZIAN, RAPHAEL GHERMEZIAN,
TRIPLE FIVE GROUP LTD., TRIPLE FIVE
WORLDWIDE, TRIPLE FIVE
WORLDWIDE DEVELOPMENT CO. LLC,
MEADOWLANDS DEVELOPMENT
LIMITED PARTNERSHIP, AMEREAM LLC,
AMEREAM DEVELOPMENT, LLC,
MEADOW BASEBALL, LLC, MEADOW
HOTEL, LLC, MEADOW A-B
OFFICE, LLC, MEADOW C-D
OFFICE, LLC, MEADOW ERC DEVELOPER,
LLC, MEADOWLANDS ONE LLC, COLONY
CAPITAL, LLC and ABC CORPS. 1
THROUGH 10,

                    Defendants.

Case No.: 13 Civ. 4117 (WHP)

FIRST AMENDED VERIFIED
COMPLAINT AND
<u>JURY DEMAND</u>



Plaintiffs, MARK J. PODLIN ("Mark Podlin" or "Mr. Podlin") and PODLIN

INTERNATIONAL REALTY, LTD. ("Podlin Int'l," and together with Mark Podlin, collectively

"Podlin" or "Plaintiffs"), by and through their attorneys, Thompson Hine LLP, as and for their

First Amended Verified Complaint against defendants NADER GHERMEZIAN ("Nader"),

DONALD GHERMEZIAN ("Donald"), RAPHAEL GHERMEZIAN ("Raphael," and together

with Nader and Donald, the "Ghermezians"), TRIPLE FIVE GROUP LTD. ("Triple Five

Group"), TRIPLE FIVE WORLDWIDE, TRIPLE FIVE WORLDWIDE DEVELOPMENT CO.

LLC ("Triple Five Worldwide Development"), MEADOWLANDS DEVELOPMENT LIMITED

PARTNERSHIP ("MDLP"), AMEREAM LLC ("Ameream"), AMEREAM DEVELOPMENT, LLC ("Ameream Development"), MEADOW BASEBALL, LLC ("Baseball LLC"), MEADOW HOTEL, LLC ("Hotel LLC"), MEADOW A-B OFFICE, LLC ("A-B Office"), MEADOW C-D OFFICE, LLC ("C-D Office"), MEADOW ERC DEVELOPER, LLC ("ERC"), ABC CORPS. 1 THROUGH 10 ("ABC Corp. Defendants," and together with Triple Five Group, Triple Five Worldwide, Triple Five Worldwide Development, MDLP, Ameream, Baseball LLC, Hotel LLC, A-B Office, C-D Office and ERC, collectively, the Triple Five Defendants) MEADOWLANDS ONE LLC ("Meadowlands One") and COLONY CAPITAL, LLC ("Colony," and together with the Ghermezians, the Triple Five Defendants and Meadowlands One, collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This case involves a fraud perpetuated by the Ghermezians and the Triple Five Defendants (which entities are owned and controlled by the Ghermezians as part of their deceitful and fraudulent business enterprise) to induce Mark Podlin to be the procuring cause in gaining control for them of the then-vacant Xanadu Meadowlands Mall, renamed the American Dream@Meadowlands (hereafter referred to as "Xanadu" or "The American Dream@Meadowlands"), located in the Meadowlands Sports Complex in South Rutherford, New Jersey, for the purposes of redeveloping the retail mall and entertainment complex into one of the largest such facilities in the world, all to their tremendous profit, gain and benefit.

2.     According to publicly available information, The American Dream@Meadowlands "`[c]alled the ugliest damn building in New Jersey and maybe America,' by governor Chris Christie, the controversial project received another lease on life . . . when a Canadian developer Triple Five Group struck a deal with the NJ Sports & Exposition Authority

to take over the development of the long-dormant mall. . . . As envisioned by the Triple Five Group, American Dream@Meadowlands will be the largest retail and entertainment complex in the United States and one of the largest, if not the largest, in the world."

3.    The Ghermezians and the Triple Five Defendants have publicly announced that the total value of The American Dream@Meadowlands project is worth more than Two Billion Dollars.

4.    Prior to the Ghermezians' and the Triple Five Defendants' fraud on Podlin, they had tried to obtain the redevelopment rights to The American Dream@Meadowlands and had failed.

5.    When they thought that the project was going to another developer, they quickly reached out to Mark Podlin (who was well-known in the industry and uniquely qualified for the task) and convinced him through misrepresentations, false promises and underhanded tactics to go out and get the project for them.

6.    In February 2010, in New York, the Ghermezians and the Triple Five Defendants hired Mark Podlin individually as an employee pursuant to a fraudulently-induced oral employment agreement as CEO of their Triple Five's "International Shopping Center Development Division" specifically for the purpose of getting him to try to obtain the redevelopment rights to The American Dream@Meadowlands project.   Pursuant to the employment agreement, the Ghermezians and the Triple Five Defendants agreed to compensate him with a monthly salary and a commission rate equal to 10% of the gross value of any project for which Podlin was the procuring cause (including specifically The American Dream@Meadowlands project), plus 10% of the increased value of any such project based upon Podlin's redevelopment efforts after acquisition.

7.      Mr. Podlin was installed in offices at Triple Five's Edmonton Headquarters and began working in earnest on bringing in The American Dream@Meadowlands project for Triple Five.

8.      When Mark Podlin repeatedly asked Nader Ghermezian for the written employment agreement that Nader told him was being drafted by his in-house attorney, Nader made up excuse after excuse, always promising that the document would be forthcoming.  Then, Nader indicated that the agreement had to be restructured as a consulting arrangement.  Nader Ghermezian indicated that there were internal business and political reasons that required them to have a "consulting" relationship as opposed to the employment relationship into which they had already entered.  All of this was a means of buying further time while keeping Podlin focused on bringing in The American Dream@Meadowlands project.

9.      All the while, Mark Podlin worked to obtain The American Dream@Meadowlands project.  Among other things, he conceived of a specific redevelopment and repositioning plan that he knew would succeed for the project and which would be well-received by the State of New Jersey and the Sports and Exposition Authority (the "Authority"). He also utilized his experience, project-specific expertise and critical contacts to reach out to the New Jersey Sports and Exposition Authority, the office of the Governor of New Jersey and numerous other influential persons, and persuade them to consent to a transfer of control of the redevelopment of The American Dream@Meadowlands project to the Ghermezians and the Triple Five Defendants.

10.     Ultimately, Mark Podlin was successful.

11.     But for Podlin's efforts, the Ghermezians nor the Triple Five Defendants would not have succeeded in obtaining the redevelopment rights to The American

4

Dream@Meadowlands.  Podlin was in fact the procuring cause of obtaining the critical consents from the State of New Jersey and the New Jersey Sports and Exposition Authority.

12.     Only after Mr. Podlin had done all that was necessary for the Ghermezians and the Triple Five Defendants to obtain control of the project, and succeeded for them where they had previously failed, did they inform him that they would not pay him, and, in fact, to add insult to injury, have engaged in a campaign to defame Mark Podlin in the industry.

13.     Plaintiffs also join Meadowlands One (the seller of the rights to the entertainment/retail component of the project to the Triple five Defendants) and Colony Capital, LLC (holder of the Ground Lease on the American Dream@Meadowlands from the New Jersey Sports and Exposition Authority) as parties because they have benefitted from Podlin's acts as the procuring cause of the transactions.  If the Ghermezians and the Triple Five Defendants fail to pay the amounts due to the Plaintiffs for their claims against them, Plaintiffs are entitled to receive payment directly from, among others, Meadowlands One and Colony Capital, LLC.

## PARTIES

### Mark J. Podlin

14. Plaintiff Mark J. Podlin is an attorney, real estate broker and consultant, and a registered investment advisor.  He is domiciled in the State of Georgia, and maintains a principal place of business at Saint Simons Island, Georgia with a mailing address at PO Box 20989, Saint Simons Island, Georgia 31522.

15. Mr. Podlin is admitted to the practice of law and is active in New York, Georgia, and Illinois.  He was first admitted to the practice of law in 1978 after graduating from the University of Georgia Law School.

16. Mr. Podlin is a licensed as a Real Estate Broker and is active in New York, Georgia and Illinois.  He is also licensed as a Registered Investment Advisor in Georgia.

**Podlin International Realty Ltd.**

17. Plaintiff Podlin International Realty, Ltd. is a corporation organized under the laws of the State of Georgia and maintains a business address at Saint Simons Island, Georgia with a mailing address at PO Box 20989, Saint Simons Island, Georgia 31522.

18. Podlin Int'l is wholly owned by Mark Podlin and provides real estate development and investment services to various clients domestically and internationally.

**The Ghermezians**

19. Upon information and belief, defendant Nader Ghermezian is an individual domiciled in the State of New York and resides at 3333 Henry Hudson Parkway in Riverdale, New York. He also maintains business offices at that address and also at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

20. Upon information and belief, defendant Donald Ghermezian is an individual domiciled in the State of New York and resides at 3333 Henry Hudson Parkway in Riverdale, New York.   He also maintains business offices at that address and also at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

21. Upon information and belief, defendant Raphael Ghermezian is an individual domiciled in the State of New York and resides at 3333 Henry Hudson Parkway in Riverdale, New York.   He also maintains business offices at that address and also at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

**The Triple Five Defendants**

22. According to its website, and upon information and belief, defendant Triple Five Group Ltd. which also goes by the name and/or does business as Triple Five Group and/or Triple Five Group of Companies, "is a multinational conglomerate and diverse development and finance corporation, with offices in major U.S. and Canadian cities." Upon information and belief, Triple Five Group Ltd. maintains a principal place of business within the State of New York at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

23. Upon information and belief, defendant Triple Five Worldwide is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

24. Upon information and belief, defendant Triple Five Worldwide Development Co. LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

25. Upon information and belief, defendant Meadowlands Development Limited Partnership is a member of the "Triple Five Group of Companies," and is a limited partnership organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

26. Upon information and belief, defendant Ameream LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

27. Upon information and belief, defendant Ameream Development, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

28. Upon information and belief, defendant Meadow Baseball, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

29. Upon information and belief, defendant Meadow Hotel, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

30. Upon information and belief, defendant Meadow A-B Office, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in

Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

31. Upon information and belief, defendant Meadow C-D Office, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

32. Upon information and belief, defendant Meadow ERC Developer, LLC is a member of the "Triple Five Group of Companies," and is a limited liability company organized under the laws of the State of New York and maintains a business address at 3333 Henry Hudson Parkway in Riverdale, New York and also maintains a business address at 8882 170 St. Nw. Suite 3000, T5T 4M2 Edmonton T5T 4M2 AB Canada.

33. Upon information and belief, defendants ABC Corps. 1 through 10 are fictitious names of entities, the names of which Plaintiffs do not presently know, but which are members and affiliates of the "Triple Five Group of Companies," and which have been used by the Ghermezians and the other Triple Five Defendants to perpetrate the fraud on Plaintiffs and/or to be used as alter egos as part of the overall ownership structure to hold the assets and rights thereby obtained in The American Dream@Meadowlands. Upon discovery of the true identities of the ABC Corp. Defendants, Plaintiffs will move to amend the pleadings to identify them by their true names and identities.

34. As set forth further in this First Amended Verified Complaint, upon information and belief, each of the Triple Five Defendants have been used as or participated in part of the scheme to defraud Podlin and/or have been used to hold some component of the American

Dream@Meadowlands project after it was acquired.  Plaintiffs do not currently know at what time each of the Triple Five Defendants were formed.  Accordingly, as used herein, the term "Triple Five Defendants" means those of the Triple Five Defendants as were then in existence at the relevant time.

**Meadowlands One LLC**

35. Upon Information and belief, Meadowlands One LLC is a limited liability company organized under the laws of the State of Delaware and maintains a business address at 32031 Xanadu Drive, East Rutherford, New Jersey.

36. Upon information and belief, Meadowlands One LLC was an entity controlled by the lenders to the prior failed developer of Xanadu at the Meadowlands which took control of the project, and ultimately sold and assigned to defendant Ameream LLC (or some other entity controlled by the Ghermezians and the Triple Five Defendants) all of its assets, rights and interests in the entertainment and retail component of the project).

**Colony Capital, LLC**

37. Upon information and belief, Colony Capital, LLC is a limited liability company organized under the laws of the State of Delaware and maintains a business address at 660 Madison Ave, Ste. 1600, New York, NY 10065.

38. Upon information and belief, Colony owns the ground lease(s), obtained from the fee owner, the New Jersey Sports and Exposition Authority, for the property on which the American Dream@Meadowlands is located and is the ground subleasor to one or more of the Triple Five Defendants.

## JURISDICTION AND VENUE

39. This Court has original jurisdiction over this action because there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs, under 28 U.S.C. § 1332(a).

40. This Court has in personam jurisdiction over the Ghermezians, the Triple Five Defendants and Colony Capital because they are found in this district, transact business in this district or are otherwise subject to jurisdiction pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules.

41. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and misrepresentations giving rise to the claims herein occurred in this Judicial District, because the contracts alleged herein were formed in this Judicial District, and because the Defendants are found and/or transact business, directly or indirectly, in this District.

## FACTUAL BACKGROUND

**Podlin Was Uniquely Qualified To Obtain
The Redevelopment Rights To The American Dream@Meadowlands
For The Ghermezians And The Triple Five Defendants**

42. Mark Podlin is nationally and internationally renowned for providing strategic and creative solutions for complex projects in the real estate industry. Podlin Int'l is Mark Podlin's wholly-owned consulting company.

43. Podlin has also been involved at the highest levels in several complex and politically-sensitive projects in Northern New Jersey, where Mark Podlin individually, and Podlin Int'l through him, have gained certain regionally-specific expertise, maintained an excellent reputation and developed strong and important contacts at both the State and local governmental and agency levels. Such projects include:

- Moorestown Mall, Moorestown, NJ Redevelopment with the Addition of Boscov's Department Store

- Riverside Square, Hackensack, NJ, Remodel and Redevelopment with Bloomingdale's and Saks Fifth Avenue Ten Year Operating Covenant Extensions

- Palmyra, NJ Redevelopment Project--Environmental Cleanup Project with proposed major new mall

- Monmouth Mall near Freehold, New Jersey--Redevelopment supervision

44. In or around December 2009, Mark Podlin observed that Triple Five, the owner/developer of some of the world's largest malls – the West Edmonton Mall in Canada and Mall of America in Minneapolis – was seeking a top level executive to act as CEO of it's "International Shopping Center Development" operations.  The posting for the position was placed on the website of the International Council of Shopping Centers ("ICSC"), an industry-leading organization in which Mr. Podlin was a well-known member, respected and very active.

45. Mark Podlin individually was interested in being hired for the position and, accordingly, responded to the post and submitted his resume to Triple Five.

*Nader Ghermezian Contacts Podlin And*
*Seeks His Assistance To Obtain The American Dream@Meadowlands*

46. Shortly thereafter, on or about February 23, 2010, while in Chicago on other business, Mark Podlin received a phone call from Nader Ghermezian, one of the senior executives of Triple Five, and an important member of the Ghermezian family, which owns and operates Triple Five and its business interests worldwide.

47. Nader called Mr. Podlin on or about February 23, 2010 from his office located in Riverdale (The Bronx) New York.

48. During that call, Nader indicated that he knew that Mark Podlin had previously worked as the Senior Development Officer of DeBartolo Development, LLC; Executive Vice

President of JMB/Urban Retail Properties, Inc.; and Senior Vice President of Jones Lang LaSalle; as well as other significant positions in the retail industry, such as Regional Real Estate Attorney for JCPenney Company, Inc., and the Senior Real Estate Negotiator for Target Corporation.   Nader indicated that he valued the fact that Mark Podlin was also an attorney.

49. Nader indicated that he was contacting Mr. Podlin because of his years of experience in the mall redevelopment business, along with his relationships with governmental officials in the State of New Jersey.

50. Nader asked Mark Podlin if he could assist Nader in getting control of the Xanadu project at the Meadowlands.  Mark Podlin stated that he believed he could provide unique assistance in the efforts to get control of the Xanadu project.

51. During that same call, Nader also asked Mark Podlin if he was interested in becoming the Chief Executive Officer of Triple Five's International Shopping Center Development Division – the position that Triple Five was seeking to fill by its posting on the ICSC website and to which Podlin had responded.  Mark Podlin responded that he was interested in being hired for that position.

52. Nader asked Mark Podlin if he would come to New York immediately to meet with him at his Triple Five New York Headquarters Office located at 3333 Henry Hudson Parkway in Riverdale, New York.  Mr. Podlin agreed and immediately made arrangements to fly to New York to meet with Nader at his offices the next day, February 24, 2010.

*The Ghermezians And The Triple Five Defendants Hire*
*Podlin As CEO On Agreed-Upon Terms*

53. Mark Podlin flew to New York, and on February 24 met with Nader and other members of the Ghermezian family involved in Triple Five at the Triple Five's New York

Headquarters located in Riverdale, New York.  The meeting commenced at 1 p.m. and lasted for approximately three hours.

54. At the outset of that meeting, Nader asked Mark Podlin to sign a non-disclosure agreement.  Mr. Podlin did so in his individual capacity.

55. During this three-hour meeting, Nader primarily focused on asking questions about how Mr. Podlin might be able to help Triple Five get control of Xanadu at the Meadowlands.

56. Mark Podlin explained to Nader that, years ago, when the Meadowlands was first proposed, he had been asked by a headhunter about becoming involved in developing the project for the original developer, but he had not pursued it at that time.  However, Mr. Podlin explained that he was very interested in redeveloping the mall, now that the original development concept had not been successful.  Mark Podlin explained his ideas about how a re-development and re-positioning of the mall was necessary to bring it to successful operation.  This was an area in which Podlin had significant experience and expertise – including specifically in Northern New Jersey.

57. Nader initially expressed some doubts that Mark Podlin could successfully position Triple Five to get control of Xanadu at the Meadowlands because he had heard that The Related Group was a "shoe-in" for the deal due to the development project they had successfully completed at Columbus Circle in Manhattan.  Nader, in fact, said he had heard The Related Group had already signed the deal for Xanadu.

58. Mark Podlin, who had been following the project, told Nader that he did not think The Related Group had a signed deal for Xanadu.

59. Mark Podlin told Nader that he believed he might be able to succeed in getting control of Xanadu for Triple Five, if Triple Five would hire Podlin as CEO of the International

Mall Development group, as Nader had suggested on the telephone call the day prior.  Mr. Podlin told Nader that the combination of Triple Five's experience with Mall of America and The West Edmonton Mall, together with Podlin's extensive re-development experience, specific re-development plan for Xanadu and contacts in New Jersey, could be sold as the winning solution to the necessary parties to get the deal for Triple Five.  Podlin explained that immediate action was necessary if they were to be successful.

60. At that point, Nader and Mark Podlin discussed the terms upon which Mr. Podlin might become CEO of the International Shopping Center division of Triple Five.  Included in this discussion were the terms of the compensation package for Mr. Podlin. Nader asked Mr. Podlin how much compensation he would require and what the structure of the employment agreement would be.  After some discussion about compensation arrangements, Mr. Podlin initially proposed that Triple Five would pay to him (i) a monthly non-refundable salary of $12,000 starting immediately; plus (ii) a commission-based compensation package equal to (a) 10% of all fees generated from Xanadu and every other deal Podlin worked on; plus (b) 5% of the value of the project at the time Triple Five took it over; plus (c) 5% of the increased value of the project over time; plus (d) a discretionary success bonus.

61. Mark Podlin and Nader negotiated for more than an hour over what the terms of the employment and the compensation structure would be if Podlin agreed to work for Triple Five as CEO of the International Mall Development Group.   A number of different ideas and compensation packages were discussed.

62. Finally, during that meeting, Nader and Mark Podlin specifically agreed that Mr. Podlin would be employed in his individual capacity by Triple Five as CEO of the International Mall Development Group, commencing immediately, and that he would be paid a monthly salary

of $12,000 per month.  Further Nader and Mark Podlin specifically agreed that in addition to the monthly salary, Mark Podlin would receive a commission-based component to his compensation equal to 10% of the appraised value of all deals he brought in, including specifically and especially the Xanadu at The Meadowlands (which had not yet been renamed American Dream@Meadowlands).  Finally, Nader and Mr. Podlin agreed that Mr. Podlin would receive an additional 10% of the increased value of projects Mark Podlin developed or redeveloped, including specifically and especially Xanadu at The Meadowlands.

63. While Nader specifically agreed to this oral employment agreement at that time, Nader stated that before it could be considered final, he needed Mark Podlin to meet his brother Raphael Ghermezian, who also lived in New York, but who would not be in the office until the following day, Thursday, February 25, 2010.

64. Having reached a conditional agreement, subject to meeting Raphael, the meeting concluded at approximately 4:00 p.m.

65. The next day, on Thursday, February 25, 2010, Mark Podlin again met with Nader Ghermezian at the Triple Five New York Headquarters located at 3333 Henry Hudson Parkway in Riverdale, New York.

66. Mark Podlin was accompanied in his visit this day by Randi La Ferney ("La Ferney"), Podlin's long-time consultant on leasing operations, who was present during the entire time and was witness to all of the conversations which took place.

67. This time, as expected, Raphael Ghermezian was also in attendance.   At the beginning of the meeting, Nader also introduced Mark Podlin and Ms. La Ferney to his other relatives Roy, Justin, and Dahlia.

68. Throughout the meeting, Nader, Raphael, Podlin and La Ferney discussed in detail the approach Podlin would take to attempt to deliver the deal to Triple Five to take over Xanadu and whether or not Podlin thought he could really succeed. Podlin told the Ghermezians that he believed he could succeed and that he had already made some inquiries to the some of his contacts in Palmyra, New Jersey, where he had previously worked on a major enclosed mall and land reclamation project for two years while he was the Senior Development Officer for DeBartolo Development, LLC.

69. Nader seemed very anxious to hear everything Mark Podlin knew about the Xanadu project (which was a substantial and detailed amount of information) and the contacts he had who might assist him in getting control of Xanadu for Triple Five.

70. While Mark Podlin explained to the Ghermezians that there was no guarantee that he could get control of Xanadu, Mark Podlin stated that he was confident that his efforts might be the *only* avenue to get control of the project for the Ghermezians and the Triple Five Defendants. Mr. Podlin described his redevelopment experience, particularly in New Jersey i.e., the redevelopment of Riverside Square in Hackensack with Bloomingdales and Saks Fifth Avenue; Moorestown Mall where Podlin added Boscov's Department Store; Monmouth Mall; and most recently, the major mall development project in Palmyra in which Podlin had been involved for more than two years.

71. Mark Podlin told Nader that he thought he could sell Triple Five, owner of Mall of America, to the New Jersey Sports and Exposition Authority, which had ultimate decision-making authority as to who actually took over Xanadu to redevelop it and from which the necessary consent was to be obtained.

### *The Employment Agreement*

72. With Raphael and Ms. La Ferney present in the room, Mark Podlin and Nader again discussed employment compensation. Mark Podlin reiterated that he would have to have a minimum salary of $12,000 per month to work as CEO of the Triple Five International Mall Development Group; plus a commission of 10% of the appraised real estate value of every deal Mark Podlin brought in to Triple Five; plus 10% of the increased value of the project over time. Nader tried several times to convince Mark Podlin to accept less, promising to guarantee that Mark Podlin would receive a large portion of the "fees" brought in by any project, but because, in Mark Podlin's view, Nader couldn't adequately explain what kind of fees he was talking about or how those could ever be estimated, Mark Podlin clearly stated that he could not agree to Nader's proposal.

73. Mark Podlin reiterated that he wanted $12,000 per month; plus 10% of the real estate value of any project at the time it was acquired; plus 10% of the "increased value" of such projects that he worked on. Mr. Podlin explained to Nader and Raphael the basis for his request. The commission of 10% of the real estate value of the any project at the time it was acquired was to compensate Mark Podlin for bringing the project in; and, the 10% of the "increased value" of the deals he worked on was to compensate Mark Podlin for working to redevelop the property and add additional value to it after acquisition and over time.

74. During the latter part of this meeting with Nader and Raphael on Thursday, February 25, 2010, Mark Podlin made a special point of saying to Nader that if Mark Podlin were to be successful in getting the Xanadu deal for Triple Five, then he (Mark Podlin) also wanted the Ghermezians' agreement that he would be the person to run the entire Xanadu redevelopment operation. Nader stated that that was acceptable, but that, of course, the rest of the Ghermezian

18

family would also be involved because they owned West Edmonton Mall and Mall of America and "knew how to operate big malls." Mr. Podlin said that he understood that but they would have to have a specific agreement that if he were to help them get Xanadu, he (Mark Podlin) would be the one to run the redevelopment.

75. At this point, on February 25, 2010, after the full agreement had been discussed, explained and clearly stated so that everyone understood what the terms being agreed to were (i.e., $12,000 per month flat salary; plus 10% of the appraised real estate value all deals Mark Podlin brought in; plus 10% of the increased value after redevelopment, and Mark Podlin was to be primarily in charge of the redevelopment of Xanadu), Nader and Raphael both shook their heads affirmatively and specifically said that they agreed. After agreeing, Nader added: *"OK OK, but you have to get it for us first."* And that is exactly what Mark Podlin immediately set out to do -- successfully.

76. The following day, Friday, February 26, 2010, Mark Podlin moved from the Royalton Hotel to the Sheraton Hotel on 52nd Street. That afternoon, he received a call from Nader. Nader tried to convince Mark Podlin to change the agreement and instead to work for $12,000 per month but only 2% equity in the deals. Mark Podlin specifically told him that that would not be acceptable and that he would only work for $12,000 per month (an artificially low figure designed only to meet minimal living costs) if Mark Podlin got 10% of the real estate value of projects brought in, plus 10% of the increases in that value after Mark Podlin redeveloped or developed the property further – as they had already agreed the day before.

77. Nader said he understood and again said he accepted the agreement made the previous day. Nader then said that Mark Podlin was hired as CEO of the Triple Five World Wide Mall International Development Group to do the Xanadu deal, effective immediately (he said

"right away"), and indicated that he wanted Mark Podlin to come to Canada and work with him in Triple Five's Headquarters Office in Alberta, Canada, located inside West Edmonton Mall.

### *Podlin Begins Work As CEO of the Triple Five International Mall Development Group*

78. Nader said he wanted Mark Podlin to start immediately by working with him in New York and attending a meeting with him on Sunday, February 28, with Kevin O'Neill, who Nader said was his head of International Construction for a project Nader was hoping to do in Libya with the Kaddafi regime.

79. Mark Podlin attended the meeting on Sunday, February 28, 2010, with Nader, Kevin O'Neil and others at the Plaza Hotel on Central Park.

80. Immediately after the meeting, Nader told Mark Podlin that he wanted him to fly to the Triple Five headquarters in Alberta, Canada, with Nader that Sunday night on the same flight.

81. Podlin lives in Georgia and had only come to New York from Chicago on an emergency basis because of Nader's call. He told Nader that he could not do so on such short notice, particularly, since he did not have his United States Passport with him (Mark Podlin had no idea he would be asked to leave the country when he originally left home).

82. Nonetheless, Mark Podlin stated that if Nader confirmed that they "had [their] deal on the terms [they] had agreed--$12,000 per month [plus] 10% of the value of the deals present and future" – Podlin would arrange to come to Alberta on Monday, the very next day, after he had flown back home to St. Simons Island, Georgia to get his passport and repack for an extended trip to Canada.

83. In response, Nader said "Yes, yes. I will have my in-house attorney draw up the agreement in writing when I get back to Canada."

84. Because time was of the essence with obtaining control of the Xanadu redevelopment project, while still in New York, Mr. Podlin began calling his business and political contacts within New Jersey to determine the most effective route for gaining control of the project, and who could most effectively help him gain access to the Governor of New Jersey and the New Jersey Sports and Exposition Authority.

### *Podlin Travels To Triple Five Headquarters In Edmonton*

85. Mark Podlin flew back home through Jacksonville, Florida, on Sunday night, February 28, 2010, from LaGuardia Airport in New York. The next day, on Monday, March 1, 2010, Mark Podlin flew from Jacksonville, Florida, to Canada. Triple Five paid for his stay at the Fantasyland Hotel, which is located within West Edmonton Mall (owned by Triple Five), the largest mall in North America. The offices of Triple Five are located a short walk across the mall from the Fantasyland Hotel, where Nader had arranged for Mark Podlin to have a permanent office. Indeed, Mark Podlin's name and internal telephone extension were put on the "Triple Five – Head Office" internal telephone directory.

86. When Mark Podlin arrived at Triple Five's Headquarters in the West Edmonton Mall in Alberta, Canada, on Tuesday morning, March 2, 2010, he was first processed through the security office in the mall where they took his picture and created an ID card and security pass card in order to enter the offices. Mark Podlin noticed immediately that the ID he was given was not an "Employee" ID, but was instead labeled as a "Consultant" ID. He realized this was an error, and pointed it out to the security personnel, but the person in the security office said that he should just use that ID for the time being until they got around to changing it later.

87. Mark Podlin proceeded to the Triple Five World Headquarters, where he was met by Nader's Corporate Executive Assistant (and from that point forward, Mark Podlin's assistant as well), Donna Hildebrandt, who showed Mark Podlin to his new office.

88. Later in the morning, Nader arrived and he said to Mark Podlin that the person involved in the Libyan development deal (whom Mark Podlin had met in New York at the meeting with O'Neill) had already called, and that they needed to set up a conference call right away.

89. Mark Podlin settled into his office at the Triple Five Headquarters in Alberta and began working on a variety of projects, including the possibility of purchasing a jet plane from a Libyan concern for lease to a group of Nigerians, and a special project involving potential investment in carbon credits, as well as Uranium mining, in the Congo.

90. However, Mark Podlin was especially focused on the acquisition of Xanadu.

***Podlin Is The Procuring Cause Of The Ghermezians And
The Triple Five Defendants Obtaining Control Of
The American Dream@Meadowlands Project***

91. During these early days in the Triple Five West Edmonton Mall Headquarters, Mark Podlin made significant and important progress in obtaining the redevelopment rights for The American Dream@Meadowlands project.

92.     Among other things, he conceived of a specific redevelopment and repositioning plan that he knew would succeed for the project and which would be well-received by the State of New Jersey and the Sports and Exposition Authority.  This was a critical key to the success of his efforts as the prior development plan had failed and the State and the Authority desperately wanted (needed) the redevelopment to succeed.

93. In addition, Mark Podlin made numerous phone calls and had various discussions aimed at positioning Triple Five to acquire the redevelopment project at Xanadu.

94. In advance of calling his contacts in Palmyra, Mark Podlin asked Nader if Triple Five would be interested in pursuing the major land reclamation and mall development deal that Mr. Podlin had been working on originally with DeBartolo in Palmyra, New Jersey, since DeBartolo had decided to get out of the mall development business during the 2008 business downturn. Nader assured Mark Podlin that if Triple Five got the Meadowlands deal, they would also seriously look at the Palmyra deal.

95. During these initial days, Mark Podlin made numerous calls and had discussions with his contacts from the Palmyra project, including Democratic Mayor John Gural and the City Attorney Ted Rosenberg, as well as various people involved with the State of New Jersey Governor's Office and the New Jersey Sports and Exposition Authority.

96. Mark Podlin called Palmyra Mayor John Gural to get his advice on who held the "keys" to the Xanadu project. Mayor Gural counseled that Podlin needed to get both Democrats and Republicans on board, and that especially important was to get the "ear" of Jon Hanson who was appointed by the Governor to be the representative to the Authority Board on this issue, and he was viewed as the "lead guy."

97. Thereafter, Mark Podlin began making calls to influential members of both the Democratic and Republic parties in New Jersey.

98. Mark Podlin spoke with Mark Stefanacci, General Counsel and COO of the Authority Board.  Stefanacci was instrumental in advising Podlin on key members of the Board with whom Podlin needed to discuss Triple Five's interest and suitability for the redevelopment of Xanadu.

99. Beginning as early as Thursday, March 11, 2010, Podlin spoke with Stefanacci to arrange a major conference call with Jon Hanson. Stefanacci told Podlin that New Jersey Governor Chris Christie had appointed Hanson to help him solve the "problems" associated with Xanadu at the Meadowlands.

100.    Mark Podlin spoke with John Hanson early in the process and again several times thereafter.  Mr. Podlin advised Hanson that he (Podlin) didn't think that The Related Group was the right developer for the project and explained why.  He also explained why Triple Five was the right developer.

101.    Mark Podlin, with Stefanacci's assistance, was able to set up a call with Hanson and key members of the Ghermezian family, including Nader.

102.    In advance of the call with Hanson, Nader convened an international conference call with various members of the Ghermezian Family located in Canada and the United States to discuss the overall purpose and objective of the call.

103.    On the call with Hanson, which occurred an hour after the family pre-call, Mark Podlin took the lead and made introductions.  He introduced all the parties during call, and stated that based on his experience in redeveloping major enclosed malls, the Ghermezian Family had hired him as CEO of Triple Five's International Mall Development Group.  Mark Podlin explained that he and Triple Five believed that together they could effectively reposition and redevelop Xanadu at the Meadowlands into a much more successful entertainment driven enclosed mall which would become a major tourist attraction for the State of New Jersey.  Mr. Podlin went into detail about the various elements comprising both the Mall of America and West Edmonton Mall and how it was Triple Five's objective to redevelop Xanadu by including some of these more successful elements and to also bring in new much more modern elements to

update the concepts that had been so successful at Triple Five's two other major malls.  Mr. Podlin went into detail about the plan he had conceived for the redevelopment and repositioning of Xanadu.

104.    Mark Podlin went into his own background in detail, particularly his previous (very successful) redevelopment activities at Riverside Square in Hackensack, New Jersey, and his work recently on redeveloping Palmyra.  Mark Podlin explained that by having New Jersey bring in Triple Five with him (Podlin) personally leading the redevelopment effort, Triple Five would be very successful at redeveloping Xanadu in a way that would show how the ultimate goal of Xanadu could still be attained – a project the State and the Authority wanted desperately to succeed.

105.    The call with Mr. Hanson was a great success.

106.    After the conference call, Nader asked Mark Podlin to draft a letter to Hanson that would recap the discussion and bring Triple Five to the next phase of negotiations in the process of taking over Xanadu.  Mark Podlin did so, and that letter was sent to Hanson under Nader's signature.

107.    That same day, Mark Podlin also sent emails to the head of real estate for Bloomingdale's asking him if he would be interested in placing a store in the Xanadu project if Triple Five could come up with a reasonable plan that he approved.

108.    Mark Podlin also made calls to members of the Board of the New Jersey Sports and Exposition Authority and other influential people, including Wes Lange, to whom he spoke on several occasions.

109.    For example, on Friday, March 12, while in the Minneapolis airport flying from Edmonton to Jacksonville, Florida, Mark Podlin called and spoke with Lange, and asked him if

he thought he could support Triple Five's efforts to become involved with the redevelopment of Xanadu. Lange said yes.

110.    Mark Podlin also called and spoke with other Authority Board Members over the next several days and followed up with emails to them and to Nader and other members of the Ghermezian Family. Among others, Mark Podlin spoke to Board member Anthony Scardino.

111.    During this period of time, Mark Podlin repeatedly asked Nader Ghermezian for the written employment agreement that Nader told him was being drafted by his in-house attorney. Each time, Nader made up excuse after excuse, always promising that the document would be forthcoming. Initially, Nader indicated that the in-house lawyer had other more pressing business, and assured Mr. Podlin it would get done.

112.    Eventually, Nader indicated that the issue for the delay was that the employment agreement had to be restructured as a consulting arrangement instead. Nader Ghermezian indicated that there were internal business and political reasons that required them to have a "consulting" relationship as opposed to the employment relationship into which they had already entered.

113.    Mr. Podlin believed Nader and his assurances that it would get done and that the written document was just a formality. Accordingly, Mr. Podlin continued his efforts to bring in the Xanadu redevelopment project.

114.    Mark Podlin flew back to Edmonton on Wednesday, March 17. During that week, he continued his correspondence and calls in support of his efforts to get control of Xanadu, while also concurrently working on the other deals that Nader wanted undertaken in Libya and the Congo.

*The Ghermezians And The Triple Five Defendants Breach The Employment Agreement*

115.    Having left for home in the interim, on Monday, March 29, 2010, Mark Podlin flew back to Edmonton (accompanied by his son).

116.    By this point in time, Mark Podlin had done all that was necessary for the Ghermezians and the Triple Five Defendants to obtain control of the project. He had introduced the Ghermezians and the Triple Five Defendants to the right contacts for getting the consent. He had developed and laid out the strategy and plan for redevelopment and repositioning of the project and had convinced the necessary individuals at the State and Authority level of the reasons why the Ghermezians and the Triple Five Defendants were the right group for the successful redevelopment of the Xanadu project.

117.    And, Mr. Podlin did all this in a relatively short time frame, and succeeded for the Ghermezians and the Triple Five Defendants where they themselves had previously failed.

118.    At a meeting on Friday, April 2, Mr. Podlin met with Nader in the conference room at Triple Five (both Mark Podlin's and Nader's sons were also in attendance).

119.    Mark Podlin again raised the fact that he had still not received the promised written employment contract (that Nader had repeatedly said was being drafted by his in-house attorney) and also that he had not received the agreed upon $12,000 monthly salary payment. For the first time, and only after Mark Podlin's substantial efforts had brought the Xanadu project to Triple Five, Nader said that he didn't "like to pay money until he was making money" and that notwithstanding their agreement, Nader was not "going to pay [Mark Podlin] anything until [Triple Five] started making money on the projects."

120.    Mark Podlin protested and told Nader that that was not the deal that he had specifically made with him in New York. Mr. Podlin recounted all the efforts he had made,

among other things, in putting together the redevelopment plan and introducing Nader and Triple Five to the New Jersey Sports and Exposition Authority and the Governor of New Jersey through Mr. Hanson and others.

121.    Nader agreed in front of all present that yes, what Mark Podlin was saying was all true, and while he appreciated it, no money was coming in yet, and so he wasn't going to pay Mark Podlin anything at that time.

122.    On Tuesday, April 6, 2010, Podlin (and his son) flew back to the United States from Canada.

123.    Shortly thereafter, still in April, 2010, Nader called Mark Podlin and repeatedly asked him to fly back to Canada to continue working for him on Xanadu and other projects. Mark Podlin stated that he would not come back unless Nader agreed to live up to the employment contract he had made with him.  However, Nader would not commit to make any of the agreed-upon payment to Mr. Podlin or otherwise to abide by the employment agreement, and so Mark Podlin did not fly back to Canada as Nader requested.

124.    After that, Mark Podlin learned that Nader had begun to make up and spread stories about Mark Podlin to explain why he was no longer working in Canada for him.

### The Triple Five Defendants Announce That They Have Taken Over The $2 Billion American Dream@Meadowlands

125.    As a direct result of Mark Podlin's efforts, the Triple Five Defendants, the Ghermezians, the State of New Jersey, the Authority, Meadlands One and Colony Capital (who took over the project from the failed prior developers) entered into an agreement in principal for the Triple Five Defendants and the Ghermezians to take over Xanadu and rename it The American Dream@Meadowlands.

126.   The State, the Authority and the then-holders of the redevelopment rights and ground leases proceeded over the ensuing months to negotiate and document the deal whereby the Ghermezians and the Triple Five Defendants would take over the redevelopment of the Xanadu project.

127.   Finally, on or about December 23, 2010, the Triple Five defendants entered into a letter of intent with Colony Capital (or an entity controlled by it) relating to the Triple Five Defendants' acquiring an assignment of Colony Capital's interest in the ground lease relating to the entertainment and retail component of the Xanadu project.

128.   Annexed hereto as Exhibit 1 is a Bloomberg news report dated December 23, 2010, announcing "New Jersey's Xanadu Taken Over by Mall of America Owner Triple Five" and which states that the value of the Xanadu project is "about $2 billion" based solely on the amounts the previous owners had invested in the complex, without including the value of the ground lease itself or any future increase in value due to redevelopment.

129.   Upon information and belief, on or about May 3, 2011, Meadowlands One entered into a "Purchase and Sale Agreement" with Ameream pursuant to which it agreed to assign to Ameream all of its interests in the entertainment and retail component of the Xanadu project, including the ground lease for such component of the project.

130.   In an effort to settle the dispute between himself and Triple Five now that the deal was "inked," Mark Podlin called Nader and Don Ghermezian and asked them if they wanted to try to resolve issues between them.  Mark Podlin offered to lead the redevelopment of the project in accordance with their agreement.  Mark Podlin received an email from Don Ghermezian saying he (Don) was doing the redevelopment work and that they didn't need Mark Podlin.

131.     In response to one of Mark Podlin's emails, which was dated April 30, 2011, to Nader, Don, and Raphael Ghermezian, Nader wrote back a slanderous email that he sent in-house to a large group of people who worked for him, including his attorney, saying Mark Podlin was a "crook."

132.     Upon information and belief, thereafter, on or about December 28, 2012, Ameream Development entered into a "Purchase and Sale Agreement" with colony capital to acquire all of the other "Master Developer's and Component Entities' remaining interests in the Redevelopment Agreement and Component Groundleases."

133.     According to the publicly available "Resolution 2013-10 – Resolution Approving Transfer Of Ground Leases And Development Rights To Triple Five" of the New Jersey Sports and Exposition Authority (the "Authority Resolution"):

> [B]y letter dated May 16, 2013 (the "**Triple Five Letter**"), [defendant] Triple Five Worldwide Development Co. LLC ("**Triple Five**") has informed the Sports Authority of potential transactions under which Triple Five and/or certain of its subsidiaries and affiliates will acquire certain rights and interests with respect to the Project, which are currently anticipated to include, among other things, (i) the transfer and assignment from the existing equity owners of [defendant] Meadowlands Development Limited Partnership ("**MDLP**") to certain subsidiaries and/or affiliates of Triple Five of all of the partnership and other equity interests in MDLP, which transfer and assignment will result, directly or indirectly, in a change of control of MDLP and each of the Ground Tenants, and (ii) the transfer and assignment to certain subsidiaries and/or affiliates of Triple Five of certain documents, agreements, assets and other rights or interests relating to or affecting the properties and projects which are subject to the Redevelopment Agreement and/or one or more of the Ground Leases (collectively, the "**Transactions**"), including the assignment and assumption of the Ground Leases, and the assignment and assumption of certain rights and obligations under the Redevelopment Agreement, to certain subsidiaries and/or affiliates of Triple Five as follows:
>
> > (i)        The ERC Ground Tenant will assign to [defendant] Ameream LLC (or to another entity owned and/or controlled by Triple Five) (the "**ERC Assignee**"), and the ERC Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the ERC Ground Tenant as

tenant under the ERC Ground Lease and all of the right, title, interest and obligations of the ERC Ground Tenant under the Redevelopment Agreement;

(ii)     The Baseball Ground Tenant will assign to [defendant] Meadow Baseball, LLC (or to another entity owned and/or controlled by Triple Five) (the "**Baseball Assignee**"), and the Baseball Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the Baseball Ground Tenant as tenant under the Baseball Ground Lease and all of the right, title, interest and obligations of the Baseball Ground Tenant under the Redevelopment Agreement;

(iii)     The Hotel Ground Tenant will assign to [defendant] Meadow Hotel, LLC (or to another entity owned and/or controlled by Triple Five) (the "**Hotel Assignee**"), and the Hotel Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the Hotel Ground Tenant as tenant under the Hotel Ground Lease and all of the right, title, interest and obligations of the Hotel Ground Tenant under the Redevelopment Agreement;

(iv)     The A-B Office Ground Tenant will assign to [defendant] Meadow A-B Office, LLC (or to another entity owned and/or controlled by Triple Five) (the "**A-B Office Assignee**"), and the A-B Office Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the A-B Office Ground Tenant as tenant under the A-B Office Ground Lease and all of the right, title, interest and obligations of the A-B Office Ground Tenant under the Redevelopment Agreement;

(v)     The C-D Office Ground Tenant will assign to [defendant] Meadow C-D Office, LLC (or to another entity owned and/or controlled by Triple Five) (the "**C-D Office Assignee**"), and the C-D Office Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the C-D Office Ground Tenant as tenant under the C-D Office Ground Lease and all of the right, title, interest and obligations of the C-D Office Ground Tenant under the Redevelopment Agreement; and

(vi)     MDLP will assign to [defendant] Meadow ERC Developer, LLC (or to one or more other entities owned and/or controlled by Triple Five) (collectively, the "**RDA Assignee**"), and the RDA Assignee will assume, all right, title, interest and obligations of MDLP in and to the Redevelopment Agreement.

A copy of the Authority Resolution is annexed hereto as Exhibit 2.

134.    According to the Authority Resolution, the Triple Five Defendants also "describes (a) the new investment and financing contemplated to complete the Project, (b) the operating and management experience of Triple Five both generally and specifically with respect to projects similar to the Project, and (c) outlines the proposed construction sequence of the Project and the added water park and amusement park."

135.    By the Authority Resolution, the Authority specifically consented to the assignment to the Triple Five Defendants of the "Redevelopment Agreement," the ground subleases and various other assets, such that the Ghermezians and the Triple Five Defendants now have control and ownership of The American Dream@Meadowlands. The Authority also resolved that President of the Authority (or his designee) shall be authorized to take all actions to consummate the transactions.

136.    Notwithstanding the passage of time to complete the formal documentation and transfer of the rights and groundleases, it was Podlin's specific redevelopment plan that ultimately was adopted.

### *The Ghermezians' And The Triple Five Defendants' Fraudulent Schemes Are Part of A Routine Practice And Pattern Of Conduct*

137.    Mark Podlin learned that Nader, the Ghermezians and the Triple Five Defendants had a prior and on-going course of dealing completely consistent with the false and fraudulent manner in which they had induced to Mark Podlin to bring The American Dream@Meadowlands project to Triple Five without ever having any intention of paying Podlin or performing their agreements.

138.    For example, Mark Podlin learned that Nader had previously said the same thing (i.e., calling the person a "crook") about another respected member of the development business

-- Mark London -- who Nader sent to work in Nigeria and then refused to pay him what he had originally agreed – after London had gone to Nigeria and satisfied his work obligations.

139.   Likewise, Mark Podlin learned that Nader had also hired Norman Krone, previously head of Walgreens Real Estate Department in Chicago, and another former employee of DeBartolo Development.  Nader told Norm Krone that he was putting Krone in charge of mall development in China for Triple Five.  Mark Podlin learned from Krone when he spoke to him at the International Council of Shopping Centers Law Conference in Orlando in October 2011, that after Nader had sent Krone to China and Krone had worked for a significant period of time for Triple Five in identifying projects in China, Nader and Triple Five refused to pay to him the money that had been agreed upon, or even to pay the operating expenses Krone had incurred (and which Triple Five had agreed to pay) for the entire three years that Krone worked for Triple Five in China – leaving Krone personally responsible for significant expenses.

### *Mark Podlin And Podlin Int'l Commence Suit*

140.   Mark Podlin has made several demands for compensation based upon the oral employment contract he had with Triple Five, but each and every time, Triple Five and the Ghermezians have refused to make any payments as required.

141.   Finally, having no other remedy, Mark Podlin and Podlin Int'l commenced this lawsuit.

### FIRST CAUSE OF ACTION AGAINST THE TRIPLE FIVE DEFENDANTS AND THE GHERMEZIANS
### (Breach of Oral Employment Contract)

142.   Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "141" above as if fully set forth herein.

143.   Each of the Triple Five Defendants and the Ghermezians entered into an oral employment agreement with Mark Podlin on February 24 and 25, 2010 (the "Employment Agreement").

144.   Mark Podlin is a New York admitted attorney, is a licensed real estate broker in New York, and the Employment Agreement was entered into in New York.

145.   Pursuant to the Employment Agreement, each of Podlin, the Triple Five Defendants and the Ghermezians specifically agreed that (i) Mark Podlin was hired as CEO of the Triple Five International Mall Development Group; (ii) that the Triple Five Defendants and the Ghermezians would pay to Mark Podlin (a) a set, non-refundable salary of $12,000 per month;  (b) commissions in the amount of 10% of the appraised real estate value of every deal Mark Podlin brought in to Triple Five; (c) an additional 10% of the "increased value" of the project over time after development or redevelopment; and (iii) in the event that Mark Podlin were successful in getting the Xanadu deal for Triple Five (which he was), Mark Podlin would oversee the entire Xanadu redevelopment operation subject to reasonable involvement by the Ghermezian family.

146.   The Employment Agreement was reasonable and comports with such agreements in the industry.

147.   Mark Podlin has performed each and every one of his obligations under the Employment Agreement, except overseeing the redevelopment operations of The American Dream@Meadowlands, which he was prevented from doing by the Ghermezians and the Triple Five Defendants.

148.   Mark Podlin was the procuring cause of the Triple Five Defendants and the Ghermezians becoming the developers of the Xanadu Meadowlands Mall (renamed the

"American Dream@Meadowlands") located in the Meadowlands Sports Complex in South Rutherford, New Jersey.

149.   The announced value of the American Dream@Meadowlands project, prior to redevelopment, is $2 billion.

150.   Mark Podlin has demanded performance of each of the Triple Five Defendants and the Ghermezians under the Employment Agreement.

151.   Each of the Triple Five Defendants and the Ghermezians have failed and refused to perform their obligations under the Employment Agreement, and, among other things, have refused to make any payments due and owing to Mark Podlin under the Employment Agreement.

152.   The Triple Five Defendants' and the Ghermezians' failure and refusal to abide in any way by their obligations under the Employment Agreement constitutes breach(es) of contract.

153.   By reason of Triple Five Defendants' and the Ghermezians' breaches of the Employment Agreement, Mark Podlin has been damaged in an amount to be proved at trial, but currently believed to be not less than $200,000,000, plus interest and costs, and prays for judgment against the Triple Five Defendants' and the Ghermezians jointly and severally in such amount.

## SECOND CAUSE OF ACTION AGAINST THE TRIPLE FIVE DEFENDANTS AND THE GHERMEZIANS
### (Breach of Consulting Agreement)

154.   Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "153" above as if fully set forth herein.

155.   Plaintiffs allege this cause of action in the alternative to the First Cause of Action for breach of the oral Employment Agreement.

156.   Each of the Triple Five Defendants and the Ghermezians entered into an oral consulting agreement with Podlin on February 24 and 25, 2010, or, in the alternative, thereafter modified the oral Employment Agreement to be a consulting agreement (the 'Consulting Agreement").

157.   Mark Podlin is a New York admitted attorney, is a licensed real estate broker in New York, and the Consulting Agreement was entered into in New York.

158.   Podlin Int'l is owned by Mark Podlin and is his consulting company through which he and Podlin Int'l provide real estate and financial services to clients.

159.   Pursuant to the Consulting Agreement, each of Podlin, the Triple Five Defendants and the Ghermezians specifically agreed that (i) Mark Podlin was hired as CEO of the Triple Five International Mall Development Group; (ii) that the Triple  Five Defendants and the Ghermezians would pay to Podlin (a) a set, non-refundable salary of $12,000 per month;  (b) commissions in the amount of 10% of the appraised real estate value of every deal Podlin brought in to Triple Five; (c) an additional 10% of the "increased value" of the project over time after development or redevelopment; and (iii) in the event that Podlin were successful in getting the Xanadu deal for Triple Five, Mark Podlin would oversee the entire Xanadu redevelopment operation subject to reasonable involvement by the Ghermezian family.

160.   The Consulting Agreement was reasonable and comports with such agreements in the industry.

161.   Podlin has performed each and every one of his obligations under the Consulting Agreement,   except   overseeing   the   redevelopment   operations   of   The   American Dream@Meadowlands, which they were prevented from doing by the Ghermezians and the Triple Five Defendants..

162.    Podlin was the procuring cause of the Triple Five Defendants and the Ghermezians becoming the developers of the Xanadu Meadowlands Mall (renamed the "American Dream@Meadowlands") located in the Meadowlands Sports Complex in South Rutherford, New Jersey.

163.    The announce value of the American Dream@Meadowlands project, prior to redevelopment, is $2 billion.

164.    Podlin has demanded performance of each of the Triple Five Defendants and the Ghermezians under the Consulting Agreement.

165.    Each of the Triple Five Defendants and the Ghermezians have failed and refused to perform their obligations under the Consulting Agreement, and, among other things, have refused to make any payments due and owing to Podlin under the Consulting Agreement.

166.    The Triple Five Defendants' and the Ghermezians' failure and refusal to abide in any way by their obligations under the Consulting Agreement constitutes breach(es) of contract.

167.    By reason of Triple Five Defendants' and the Ghermezians' breaches of the Consulting Agreement, Mark Podlin and Podlin Int'l have been damaged in an amount to be proved at trial, but currently believed to be not less than $200,000,000, plus interest and costs, and prays for judgment against the Triple Five Defendants' and the Ghermezians jointly and severally in such amount.

## THIRD CAUSE OF ACTION ALL DEFENDANTS
### (Procuring Cause Liability)

168.    Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "167" above as if fully set forth herein.

169.    Podlin is a New York admitted attorney and is a licensed real estate broker in New York, and the Employment Agreement was entered into in New York.

170.   Podlin Int'l is owned by Mark Podlin and is his consulting company through which he and Podlin Int'l provide real estate and financial services to clients.

171.   As a direct result of Podlin's efforts as procuring cause on behalf of Triple Five, the State of New Jersey, the Authority, Meadowlands One and Colony Capital (which, upon information and belief, took over the project from the failed prior developers) entered into a deal for the Triple Five Defendants and the Ghermezians to take over Xanadu.

172.   The Triple Five Defendants, the Ghermezians, Meadowlands One and Colony Capital have all benefitted substantially as a result of Podlin's efforts as the procuring cause of their deal between themselves and the State of New Jersey and the New Jersey Sports and Exposition Authority.

173.   Upon information and belief, Colony Capital continues to hold the ground leases for the American Dream@Meadowlands and has benefitted substantially as a result of Podlin's efforts as procuring cause of their deal with the State of New Jersey, the Authority, the Triple Five Defendants and the Ghermezians.

174.   Upon information and belief, Meadowlands One has benefitted substantially as a result of Podlin's efforts as procuring cause of their deal with the State of New Jersey, the Authority, Colony Capital, and the Triple Five Defendants and the Ghermezians.

175.   But for Podlin's efforts, expertise, know-how and connections, the deal by which The Triple Five Defendants and the Ghermezians took take over Xanadu and renamed it the American Dream@Meadowlands would not have occurred.

176.   In the industry, commissions in the amount of 10% of the appraised real estate value of a deal together with an additional 10% of the "increased value" of the project over time

after development or redevelopment are fair and reasonable and comply with industry norms and standards.

177.   The announced value of The American Dream@Meadowlands project, prior to redevelopment, is $2 billion.

178.   Podlin has demanded fair and reasonable compensation as the procuring cause from each of the Defendants.

179.   Each of the Defendants have failed and refused to make any payments due and owing to Podlin as the procuring cause of the transaction.

180.   By reason of Defendants' failure and refusal to make any payments due and owing to Podlin as the procuring cause of the transaction, Mark Podlin and Podlin Int'l have been damaged in an amount to be proved at trial, but currently believed to be not less than $200,000,000, plus interest and costs, and prays for judgment against all Defendants jointly and severally in such amount.

## FOURTH CAUSE OF ACTION AGAINST THE TRIPLE FIVE DEFENDANTS AND THE GHERMEZIANS
### (Fraudulent Inducement of Contract, Fraud and Conspiracy to Commit Fraud)

181.   Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "180" above as if fully set forth herein.

182.   Each of the Triple Five Defendants and the Ghermezians entered into the oral Employment Agreement and/or the Consulting Agreement with Podlin to induce Podlin to work as the procuring cause on behalf of The Triple Five Defendants and the Ghermezians to obtain control of the Xanadu project and the necessary consents from the State of New Jersey and the Authority.

183.    At the time that each of the Triple Five Defendants and the Ghermezians entered into the oral Employment Agreement and/or the Consulting Agreement with Podlin, they did so with the intent not pay Podlin or to perform any of the obligations they undertook as a result of the Employment Agreement and/or the Consulting Agreement.

184.    Upon information and belief, the Triple Five Defendants and the Ghermezians colluded to and did falsely state to Mark Podlin that (i) Mark Podlin was hired as CEO of the Triple Five International Mall Development Group; (ii) that the Triple Five Defendants and the Ghermezians would pay to Mark Podlin and/or Podlin Int'l (a) a set, non-refundable salary of $12,000 per month; (b) commissions in the amount of 10% of the appraised real estate value of every deal Podlin brought in to Triple Five; (c) an additional 10% of the "increased value" of the project over time after development or redevelopment; and (iii) in the event that Podlin were to successful in getting the Xanadu deal for Triple Five, Mark Podlin would oversee the entire Xanadu redevelopment operation subject to reasonable involvement by the Ghermezian family.

185.    Mark Podlin repeatedly asked Nader Ghermezian for the written employment agreement that Nader falsely stated was being drafted by his in-house attorney. Nader made up excuse after excuse, always promising that the document would be forthcoming without any intention ever to produce or sign such a document. Then, Nader indicated that the agreement had to be restructured as a consulting arrangement. Nader Ghermezian indicated that there were internal business and political reasons that required them to have a "consulting" relationship as opposed to the employment relationship into which they had already entered. These statements were false.

186.    All of this was a means of buying further time while keeping Podlin focused on bringing in The American Dream@Meadowlands project.

187.    Upon information and belief, each of the Triple Five Defendants and the Ghermezians knew or should have known that the above-referenced representations that they made to Podlin to induce him and Podlin Int'l to enter into the Employment Agreement and/or the Consulting Agreement, and/or to act as the procuring cause of obtaining for them the Xanadu redevelopment deal, were false and misleading at the time such statements and representations were made.

188.    Each of the Triple Five Defendants and the Ghermezians knew or should have known that Podlin would rely upon such false statements, representations and information, and that such false statements, representations and information would induce Podlin to use substantial efforts, expertise, know-how and connections to obtain the deal by which the Triple Five Defendants and the Ghermezians took take over Xanadu and renamed it the American Dream@Meadowlands.

189.    At all times, Podlin reasonably believed and thought true the representations of each of the Triple Five Defendants and the Ghermezians and reasonable relied upon such false statements, assurances and information to their detriment and were thereby induced into using substantial efforts, expertise, know-how and connections to obtain the deal by which the Triple Five Defendants and the Ghermezians took over Xanadu and renamed it the American Dream@Meadowlands.

190.    The Triple Five Defendants and the Ghermezians fraudulently induced Podlin to enter into the Employment Agreement and/or the Consulting Agreement and/or to otherwise use substantial efforts, expertise, know-how and connections, in order to obtain the deal by which the Triple Five Defendants and the Ghermezians took take over Xanadu and renamed it the American Dream@Meadowlands without compensating Podlin therefor.

41

191.    Podlin was the procuring cause of the Triple Five Defendants and the Ghermezians becoming the developers of The American Dream@Meadowlands.

192.    The announced value of the American Dream@Meadowlands project, prior to redevelopment, is $2 billion.

193.    Indeed, as they intended to do from the outset and specifically at the time they entered into the Employment Agreement and/or the Consulting Agreement and/or made the above-referenced specific misrepresentations to Podlin, each of the Triple Five Defendants and the Ghermezians have failed and refused to perform any their obligations under the fraudulently induced Employment Agreement and/or Consulting Agreement and/or in accordance with their representations, and, among other things, have refused to make any payments due and owing to Podlin.

194.    The Triple Five Defendants' and the Ghermezians' failure and refusal to abide in any way by their obligations and commitments under the Employment Agreement and/or the Consulting Agreement constitutes fraudulent inducement of the Employment Agreement and/or the Consulting Agreement, fraud and conspiracy to commit fraud.

195.    The Triple Five Defendants' and the Ghermezians' failure and refusal to abide in any way by their representations and commitments reasonably relied upon Podlin constitutes fraud and conspiracy to commit fraud.

196.    As a direct result of Podlin's reasonable reliance on the Triple Five Defendants' and the Ghermezians' misrepresentations known to each and every one of them to be false and misleading, Podlin has suffered damages caused by each of the Triple Five Defendants and the Ghermezians in an amount to be proved at trial, but not less than $200,000,000, plus interest and

costs, and prays for judgment against the Triple Five Defendants' and the Ghermezians jointly and severally in such amount.

197.   In connection with the false and fraudulent activities giving rise to this cause of action, the Triple Five Defendants and the Ghermezians acted with malice, insult, intent and knowledge and with a wanton disregard of Podlin's rights.

198.   Moreover, the false and fraudulent activities giving rise to this cause of action is part of a continuing course of dealing and pattern of conduct by the Triple Five Defendants and the Ghermezians, which has been directed not only at Podlin, but at others within the industry and at the public in general.

199.   Accordingly, Podlin should be awarded punitive and exemplary damages in an amount to be awarded at trial to punish the Triple Five Defendants and the Ghermezians and to deter such conduct in the future by them and others, but not less than $500,000,000.

## FIFTH CAUSE OF ACTION AGAINST THE TRIPLE FIVE DEFENDANTS AND THE GHERMEZIANS
### (Piercing the Corporate Veil)

200.   Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "199" above as if fully set forth herein.

201.   Upon information and belief, the Ghermezians completely dominated the Triple Five Defendants, such that the Triple Five Defendants were a mere device to further the Ghermezian's personal business and fraud upon Podlin.

202.   Upon information and belief, the Triple Five Defendants were interrelated, with overlapping control and ownership, and which did not and do not abide by the necessary corporate formalities.

203.    The Triple Five Defendants are mere instrumentalities of one another and of the Ghermezians.  The separate existence of each must be disregarded to hold each individually and severally liable for the acts, debts and obligations of the others.

204.    The Ghermezians' control and domination of the Triple Five Defendants was used to defraud Podlin as set forth above, and they should be held individually and severally liable for the debts of the Triple Five Defendants and eachother.

205.    The fraudulent of the Ghermezians and the Triple Five Defendants was the proximate cause of the damages suffered by Mark Podlin and Podlin Int'l.

## SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Unjust Enrichment)

206.    Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "205" above as if fully set forth herein.

207.    Defendants and all of them acquired substantial benefits as a result of Podlin's efforts as the procuring cause of their deal relating to The American Dream@Meadowlands with and among the State of New Jersey, the Authority, the Triple Five Defendants, the Ghermezians, Meadowlands One and Colony Capital.

208.    The Triple Five Defendants, the Ghermezians, Meadowlands One and Colony Capital have all benefitted substantially as a result of Podlin's efforts as the procuring cause of the deal with the State of New Jersey and the Authority.

209.    Upon information and belief, Colony Capital continues to hold the ground leases for the American Dream@Meadowlands and has benefitted substantially as a result of Podlin's efforts as procuring cause of their deal with the State of New Jersey, the Authority, the Triple Five Defendants and the Ghermezians.

210.     Upon information and belief, Meadowlands One was an entity controlled by the lenders to the prior failed developer of Xanadu at the Meadowlands which took control of the project, and ultimately sold and assigned to defendant Ameream (or some other entity controlled by the Ghermezians and the Triple Five Defendants) all of its assets, rights and interests in the entertainment and retail component of the project), and has benefitted substantially as a result of Podlin's efforts as procuring cause of their deal with the State of New Jersey, the Authority, the Triple Five Defendants and the Ghermezians.

211.     But for Podlin's efforts, expertise, know-how and connections, the deal by which the Triple Five Defendants and the Ghermezians took take over Xanadu and renamed it The American Dream@Meadowlands would not have occurred.

212.     As a result of Defendants' failure to pay Podlin for the fair and reasonable value of the services and the fair and reasonable value of the benefits conferred upon them, Defendants and all of them have wrongfully profited and have been unjustly enriched.

213.     By reason of Defendants' unjust enrichment, Podlin has suffered injury as a result in the principal amount of at least $200,000,000 and asks for judgment against Defendants jointly and severally in the amount of such unjust enrichment, plus interest and costs.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
### (Quantum Meruit)

214.     Plaintiffs repeat and reallege each and every allegation of the Complaint contained in Paragraphs numbered "1" through "213" above as if fully set forth herein.

215.     Mark Podlin is a New York admitted attorney and is a licensed real estate broker in New York.

216.     Podlin Int'l is owned by Mark Podlin and is his consulting company through which he and Podlin Int'l provide real estate and financial services to clients.

217.     As a direct result of Podlin's efforts as the procuring cause on behalf of the Triple Five Defendants and the Ghermezians, the State of New Jersey, the Authority, Meadowlands One and Colony Capital entered into a deal for the Triple Five Defendants and the Ghermezians to take over Xanadu.

218.     The Triple Five Defendants, the Ghermezians, Meadowlands One and Colony Capital have all benefitted substantially as a result of Podlin's efforts as the procuring cause of their deal relating to The American Dream@Meadowlands with the State of New Jersey and the Authority.

219.     Upon information and belief, Colony Capital continues to hold the ground lease for the American Dream@Meadowlands and has benefitted substantially as a result of Podlin's efforts as the procuring cause of the deal with the State of New Jersey, the Authority, the Triple Five Defendants and the Ghermezians.

220.     Upon information and belief, Meadowlands One was an entity controlled by the lenders to the prior failed developer of Xanadu at the Meadowlands which took control of the project, and ultimately sold and assigned to defendant Ameream (or some other entity controlled by the Ghermezians and the Triple Five Defendants) all of its assets, rights and interests in the entertainment and retail component of the project), and has benefitted substantially as a result of Podlin's efforts as procuring cause of their deal with the State of New Jersey, the Authority, the Triple Five Defendants and the Ghermezians.

221.     But for Podlin's efforts, expertise, know-how and connections, the deal by which the Triple Five Defendants and the Ghermezians took take over Xanadu and renamed it the American Dream@Meadowlands would not have occurred.

222.   Each of the Defendants knew or should have known that Podlin had been promised and reasonably expected compensation for the work they undertook in acting as the procuring cause of the deal for the Triple Five Defendants and the Ghermezians to take over Xanadu.

223.   In the industry, commissions in the amount of 10% of the appraised real estate value of a deal, together with an additional 10% of the "increased value" of the project over time after development or redevelopment, are fair and reasonable and comply with industry norms and standards.

224.   The announced value of The American Dream@Meadowlands project, prior to redevelopment, is $2 billion.

225.   Podlin has demanded fair and reasonable compensation as procuring cause from each of the Defendants.

226.   Each of the Defendants has failed and refused to make any payments due and owing to Podlin as the procuring cause of the transaction.

227.   Podlin is entitled to compensation equal to the fair and reasonable value of Podlin's services in acting as the procuring cause of The American Dream@Meadowlands transaction in an amount to be proved at trial, but currently believed to be not less than $200,000,000, plus interest and costs, and prays for judgment against all Defendants jointly and severally in such amount.

**CONCLUSION**

WHEREFORE, Plaintiffs Mark J. Podlin and Podlin International Realty, Ltd. pray for relief as follows:

(1)     On the First Cause of Action against the Triple Five Defendants and the Ghermezians, for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest and costs;

(2)     On the Second Cause of Action against the Triple Five Defendants and the Ghermezians for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest and costs;

(3)     On the Third Cause of Action against all Defendants for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000 plus interest and costs;

(4)     On the Fourth Cause of Action against the Triple Five Defendants and the Ghermezians for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest and costs, and an award of punitive and exemplary damages in an amount to be determined at trial, but not less than $500,000,000 to punish Defendants and deter any such further or similar conduct;

(5)     On the Fifth Cause of Action against the Triple Five Defendants and the Ghermezians for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest and costs, and an award of punitive and exemplary damages in an amount to be determined at trial, but not less than $500,000,000 to punish Defendants and deter any such further or similar conduct;

(6)     On the Sixth Cause of Action against all Defendants for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest and costs;

(7)     On the Seventh Cause of Action against all Defendants for judgment jointly and severally in an amount to be determined at trial, but not less than $200,000,000, plus interest; and

(8)     For such other and further relief as this Court deems just and proper under the circumstances.

Dated:     August 23, 2013
           New York, New York

                                        **THOMPSON HINE LLP**

                                        By: _____
                                            Richard De Palma (RD-2818)
                                            335 Madison Avenue
                                            New York, New York 10017
                                            (212) 908-3969

                                        **Attorneys for Plaintiffs**
                                        *Mark J. Podlin and*
                                        *Podlin International Realty, Ltd.*

## JURY DEMAND

Plaintiffs hereby demand trial by Jury on all claims, issues and defenses herein.

**THOMPSON HINE LLP**

By: _____
       Richard De Palma (RD-2818)
       335 Madison Avenue
       New York, New York 10017
       (212) 908-3969

**Attorneys for Plaintiffs**
*Mark J. Podlin and*
*Podlin International Realty, Ltd.*

## **VERIFICATION**

I, Mark J. Podlin, an individual plaintiff and the principal of plaintiff Podlin International Realty, Ltd., hereby verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing First Amended Verified Complaint, know the contents thereof, and the same is true and correct to the best of my knowledge and belief.

Executed this 23rd day of August, 2013.

Mark J. Podlin

# EXHIBIT 1

New Jersey's Xanadu to be Taken Over by Mall of America Owner Triple Five - Bloomb...    Page 1 of 1

Bloomberg.com  |  Businessweek.com  |  Bloomberg TV  |  Premium                                    |  Register  |  Sign In

**MARKET SNAPSHOT**

| U.S. | EUROPE | ASIA | | |
|------|--------|------|---|---|
| DJIA | 14,999.60 | +35.90 | 0.24% |
| S&P 500 | 1,661.84 | +4.88 | 0.29% |
| NASDAQ | 3,654.85 | +16.14 | 0.44% |

THE FASTEST CAR
THE BOLDEST BURGUNDY
THE LATEST MUST-SEE

Our Company  |  Professional  |  Anywhere

Search News, Quotes and Opinion

HOME    QUICK    NEWS    OPINION    MARKET DATA    PERSONAL FINANCE    TECH    POLITICS    SUSTAINABILITY    LUXURY    TV    VIDEO    RADIO

# New Jersey's Xanadu to be Taken Over by Mall of America Owner Triple Five

By Terrence Dopp & Prashant Gopal - Dec 23, 2010 5:01 PM ET

0 COMMENTS                                                Q QUEUE

Triple Five, owner of the Mall of America in Minnesota, will take over development of New Jersey's stalled Meadowlands Xanadu shopping and entertainment complex as lenders seek to revive the project.

Triple Five signed a letter of intent with the lender group under a plan that is supported by New Jersey Governor Chris Christie, according to a joint statement today. Creditors took control of the project in August from a group led by Colony Capital LLC after delays in construction.



Enlarge image

Construction delayed at the Xanadu retail and entertainment venue at the Meadowlands Sports Complex in East Rutherford, New Jersey. Photographer: Timothy Fadek/Bloomberg Markets via Bloomberg

Earlier owners invested about $2 billion in the complex, which sits about 10 miles west of Manhattan near New Jersey's Meadowlands sports complex, home of the National Football League's New York Giants and New York Jets. The announcement is the first move toward the lenders' goal of having the complex "open and flourishing" in advance of the 2014 NFL Super Bowl, which will be played at the New Meadowlands Stadium.

"A successful entertainment destination will attract millions of locals and tourists to the area, create jobs and generate substantial tax revenues," Paul Ghermezian, senior vice president of Triple Five, said in the statement.

Triple Five plans to make design changes to the system of rectangular, blue interlocking blocks that make up Xanadu's exterior shell, Maureen Hooley Bausch, a spokeswoman for the Alberta-based company, said in a telephone interview today.

Interior Redesign

Bausch, who declined to provide financial details of the deal, said the complex will also undergo an interior redesign and is targeted to open in 2013 or 2014. She said initial plans are to include all aspects of the original design, such as the ski slope and Ferris wheel, though a final decision hasn't been made. More details will be released next year, the company said.

Triple Five was in the first round of bidders on the project when then-Governor James McGreevey's administration began the process. It was rejected because its plan included housing, Bausch said.

GET THE MOST POPULAR NEWS—
EMAILED EACH DAY. Learn more

HEADLINES    MOST POPULAR    RECOMMENDED

Based on your reading history you may be interested in:

**Microsoft CEO Ballmer to Retire Within Next 12 Months**
Q

**U.S. Stocks Rise Amid Plunge in Home Sales, Fed Gathering**
Q

**Six Opportunities Steve Ballmer Missed at Microsoft**
Q

**Bo Xilai Calls His Wife Crazy on Second Day of Corruption Trial**
Q

**Authorized Frozen LBE@CN (ALPHA)**
Q

**No Immigration Law Will Heal This Border**
Q

Advertisement

Disclosure

Most Popular On

Even Cord Cutters Will Have to Pay the Cable Bill

Why the U.S. Power Grid's Days Are Numbered

Microsoft CEO Steve Ballmer to Retire. What Happens Next Won't Be Pretty

Tesla's Model S Sedan Destroys Safety Tests ... Literally

Who Serves the Best Fast-Food Coffee?

**Visit Businessweek.com**

by Taboola

**EXHIBIT 2**

**RESOLUTION 2013 -10**
**RESOLUTION APPROVING TRANSFER OF**
**GROUND LEASES AND DEVELOPMENT RIGHTS TO TRIPLE FIVE**

**WHEREAS,** pursuant to Public Law 1971, Chapter 137, codified at *N.J.S.A.* 5:10-1 *et seq.*, as thereafter amended and modified, the New Jersey Sports and Exposition Authority Law (the **"Sports Authority Law"**), the Legislature of the State of New Jersey established the Sports Authority to, inter alia, promote athletic contests, spectator sporting events, trade shows and other expositions and to carry out projects as set forth in the Sports Authority Law, including but not limited to the undertaking of projects as described herein; and

**WHEREAS,** the Sports Authority owns fee title to certain real property totaling 690+/- acres located in the Borough of East Rutherford, County of Bergen in the State of New Jersey and commonly known as the "**Meadowlands Sports Complex**"; and

**WHEREAS,** in furtherance of its mission under *N.J.S.A.* 5:10-6, and in the exercise of its statutory powers, the Sports Authority determined to improve certain land within the Meadowlands Sports Complex and entered into that certain Redevelopment Agreement dated December 3, 2003, as amended October 5, 2004, March 15, 2005, May 23, 2005 and June 30, 2005 (as amended, the "**Redevelopment Agreement**"), pursuant to which the developer was granted the right, among other things, to develop and build that certain mixed-use project (the "**Project**"); and

**WHEREAS,** the Redevelopment Agreement contemplates the construction of the following components as part of the Project: (a) approximately 2.7 million square feet of entertainment, recreation and retail facilities (the "**ERC Component**"), (b) approximately 1.76 million square feet of office space (the "**A-B Office Component**" and the "**C-D Office Component**"), (c) approximately 500,000 square feet of hotel space (the "**Hotel Component**"), (d) a facility for the staging of minor league baseball games (the "**Baseball Component**"), (e) approximately 12,500 parking spaces and certain on and off-site improvements to the traffic and transportation infrastructure servicing the Project Site (the "**Infrastructure Component**"); and

**WHEREAS,** the Sports Authority entered into that certain ERC Component Ground Lease dated June 30, 2005, as amended on March 30, 2007, and December 27, 2007 (the "**ERC Ground Lease**"), in accordance with which the ground tenant (the "**ERC Ground Tenant**"), is empowered to construct the ERC Component upon a portion of the Project Site; and

**WHEREAS,** the Sports Authority entered into that certain Baseball Component Ground Lease dated June 30, 2005, as amended on December 27, 2007 (the "**Baseball Ground Lease**"), in accordance with which the ground tenant (the "**Baseball Ground Tenant**") is empowered to construct the Baseball Component upon a portion of the Project Site; and

**WHEREAS,** the Sports Authority entered into that certain Hotel Component Ground Lease dated June 30, 2005, as amended on December 27, 2007 (the "**Hotel Ground Lease**"), in accordance with which the ground tenant (the "**Hotel Ground Tenant**") is empowered to construct the Hotel Component upon a portion of the Project Site; and

1

**WHEREAS**, the Sports Authority entered into that certain A-B Office Component Ground Lease dated June 30, 2005, as amended on December 27, 2007 (the "**A-B Office Ground Lease**"), in accordance with which the ground tenant (the "**A-B Office Ground Tenant**") is empowered to construct the A-B Office Component upon a portion of the Project Site; and

**WHEREAS**, the Sports Authority entered into that certain C-D Office Component Ground Lease dated June 30, 2005, as amended on December 27, 2007 (the "**C-D Office Ground Lease**" and together with the ERC Ground Lease, the Baseball Ground Lease, the Hotel Ground Lease and the A-B Office Ground Lease, the "**Ground Leases**"), in accordance with which the ground tenant (the "**C-D Office Ground Tenant**" and together with the ERC Ground Tenant, the Baseball Ground Tenant, the Hotel Ground Tenant and the A-B Office Ground Tenant, the "**Ground Tenants**") is empowered to construct the C-D Office Component upon a portion of the Project; and

**WHEREAS**, by letter dated May 16, 2013 (the "**Triple Five Letter**"), Triple Five Worldwide Development Co. LLC ("**Triple Five**") has informed the Sports Authority of potential transactions under which Triple Five and/or certain of its subsidiaries and affiliates will acquire certain rights and interests with respect to the Project, which are currently anticipated to include, among other things, (i) the transfer and assignment from the existing equity owners of Meadowlands Development Limited Partnership ("**MDLP**") to certain subsidiaries and/or affiliates of Triple Five of all of the partnership and other equity interests in MDLP, which transfer and assignment will result, directly or indirectly, in a change of control of MDLP and each of the Ground Tenants, and (ii) the transfer and assignment to certain subsidiaries and/or affiliates of Triple Five of certain documents, agreements, assets and other rights or interests relating to or affecting the properties and projects which are subject to the Redevelopment Agreement and/or one or more of the Ground Leases (collectively, the "**Transactions**"), including the assignment and assumption of the Ground Leases, and the assignment and assumption of certain rights and obligations under the Redevelopment Agreement, to certain subsidiaries and/or affiliates of Triple Five as follows:

>       (i)      The ERC Ground Tenant will assign to Ameream LLC (or to another entity owned and/or controlled by Triple Five) (the "**ERC Assignee**"), and the ERC Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the ERC Ground Tenant as tenant under the ERC Ground Lease and all of the right, title, interest and obligations of the ERC Ground Tenant under the Redevelopment Agreement;.

>       (ii)      The Baseball Ground Tenant will assign to Meadow Baseball, LLC (or to another entity owned and/or controlled by Triple Five) (the "**Baseball Assignee**"), and the Baseball Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the Baseball Ground Tenant as tenant under the Baseball Ground Lease and all of the right, title, interest and obligations of the Baseball Ground Tenant under the Redevelopment Agreement;

(iii)     The Hotel Ground Tenant will assign to Meadow Hotel, LLC (or to another entity owned and/or controlled by Triple Five) (the "**Hotel Assignee**"), and the Hotel Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the Hotel Ground Tenant as tenant under the Hotel Ground Lease and all of the right, title, interest and obligations of the Hotel Ground Tenant under the Redevelopment Agreement;

(iv)     The A-B Office Ground Tenant will assign to Meadow A-B Office, LLC (or to another entity owned and/or controlled by Triple Five) (the "**A-B Office Assignee**"), and the A-B Office Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the A-B Office Ground Tenant as tenant under the A-B Office Ground Lease and all of the right, title, interest and obligations of the A-B Office Ground Tenant under the Redevelopment Agreement;

(v)     The C-D Office Ground Tenant will assign to Meadow C-D Office, LLC (or to another entity owned and/or controlled by Triple Five) (the "**C-D Office Assignee**"), and the C-D Office Assignee will assume from and after the date thereof, all of the right, title, interest and obligations of the C-D Office Ground Tenant as tenant under the C-D Office Ground Lease and all of the right, title, interest and obligations of the C-D Office Ground Tenant under the Redevelopment Agreement; and

(vi)     MDLP will assign to Meadow ERC Developer, LLC (or to one or more other entities owned and/or controlled by Triple Five) (collectively, the "**RDA Assignee**"), and the RDA Assignee will assume, all right, title, interest and obligations of MDLP in and to the Redevelopment Agreement.

**WHEREAS**, the Triple Five Letter describes (a) the new investment and financing contemplated to complete the Project, (b) the operating and management experience of Triple Five both generally and specifically with respect to projects similar to the Project, and (c) outlines the proposed construction sequence of the Project and the added water park and amusement park; and

WHEREAS, the Sports Authority desires to approve the Transactions and proposes to enter into that certain Consent to Proposed Transactions (the "**Consent**"); and

**NOW, THEREFORE, BE IT:**

**RESOLVED**, that the form, terms and provisions of the Consent, and the execution and delivery of the Consent are hereby ratified, confirmed and approved in all respects; and be it further

3

**RESOLVED**, that the documents, instruments and certificates contemplated as necessary and/or advisable in order to confirm, effectuate, implement, memorialize, consummate and/or perfect the Transactions and all other contracts, agreements, certificates, and instruments which are to be entered into pursuant to the Transactions, including without limitation, assignment and assumption agreements with respect to each of the Ground Leases, amendments to each of the Ground Leases, amendments to each of the memorandums of the Ground Leases, amendments to and/or assignments of the Redevelopment Agreement and other existing project documents described in the Redevelopment Agreement and/or the Ground Leases (the "**Related Agreements**") be and hereby are authorized and approved; and be it further

**RESOLVED**, that the President of the Sports Authority be, and he hereby is, authorized to enter into the Consent and the Related Agreements with such reasonable or necessary changes thereto as such officer shall approve in his sole discretion, such approval to be conclusively evidenced by the execution and delivery thereof; and be it further

**RESOLVED**, that the President of the Sports Authority or any other officer authorized by the President of the Sports Authority be, and hereby are, authorized and directed to take all such further actions and to execute and deliver all such further instruments and documents as the President shall determine to be reasonable or necessary, in the name and on behalf of the Sports Authority to fully carry out the intent and to accomplish the purposes of the foregoing resolutions, and the execution by the President or other officer of any of such instrument or document, or the doing by such officer of any act in connection with the foregoing matters, shall conclusively establish such officer's authority therefor from the Sports Authority and the approval and ratification by the Sports Authority of the instruments and documents so executed and the actions so taken.

Adopted:        May 17, 2013

4